Alberta A. **HOLLIS**, Plaintiff,

v.

**CITY OF BUFFALO**, Defendant.

No. 94–CV–539(H).

United States District Court,
W.D. New York.

Dec. 30, 1998.

David Gerald Jay, Sandra H. Adams, Buffalo, NY, for Plaintiff.

Alberta Hollis, Buffalo, NY, pro se.

James Lawrence Jarvis, Jr., Buffalo, NY, for Defendant.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

Plaintiff filed this action on July 21, 1994, alleging sexual harassment in violation of

Title VII, 42 U.S.C. § 2000e–2(a)(1), § 296 of the New York Human Rights Law, N.Y.Exec.Law § 296 ("NYHRL") and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to have the undersigned conduct any and all further proceedings in this case, including the entry of final judgment (Item 23). A bench trial commenced on July 7, 1998, and concluded on July 10, 1998. Each side called several witnesses and introduced numerous exhibits. The parties filed proposed findings of fact and conclusions of law, and oral argument was held on October 19, 1998. The following constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.

For the reasons set forth below, judgment shall be entered for the plaintiff in the amount of $30,000. The court finds that Pendolino's conduct subjected plaintiff to a hostile work environment and that the City did not take reasonable care to prevent or correct Pendolino's harassment. Furthermore, the City failed to demonstrate that there were any preventive or corrective opportunities available to plaintiff. Accordingly, defendant is found vicariously liable for Pendolino's conduct.

## BACKGROUND

Plaintiff Alberta Hollis commenced employment with defendant City of Buffalo ("City") in 1982. In February 1983, she became a permanent employee in the City's Division of Audit. She worked as a typist for the Division of Audit until early 1988, when she accepted a temporary position as an Audit Inspector. Plaintiff worked as an Audit Inspector for 6 years, from 1988 through 1993. In December 1993, plaintiff took an examination for the position of Audit Inspector, but did not score high enough to maintain her temporary appointment. As a result, in April 1995, she assumed the position of Senior Inventory Clerk (Tr. at 4–8).

It was during plaintiff's tenure as an Audit Inspector that she experienced the sexual harassment giving rise to this lawsuit. Joseph Pendolino was plaintiff's immediate supervisor when plaintiff began working as an Audit Inspector in 1988. Plaintiff testified that she did not experience any problems with Pendolino from 1988 until late 1990. However, sometime late in 1990, plaintiff's relationship with Pendolino changed. Pendolino became "obnoxious" towards her and her fellow co-workers. He began to use obscene and vulgar language and he repeatedly made derogatory comments about the plaintiff's physical appearance and the physical appearance of her co-workers. For example, he teased one woman about her thick ankles. Pendolino teased another co-worker about her face, calling her "wicked witch" and "scarecrow." On more than one occasion Pendolino made comments about plaintiff's breasts. In addition, Pendolino made obscene gestures that were directed toward plaintiff. These gestures included grabbing his groin area, moaning, calling plaintiff's nickname, "Bertie," and making gestures intimating he was having oral sex or masturbating. Pendolino would also approach plaintiff from behind and thrust himself against her as if her were engaging in sex. Plaintiff claims that Pendolino engaged in this conduct, which she called his "routine," several times on a daily basis. In fact, plaintiff claims that it happened "every time Pendolino would see her." Plaintiff testified that many fellow employees witnessed Pendolino engage in this offensive behavior, including Antoinette Klimenczko, Pendolino's immediate supervisor (Tr. at 10. 16–17, 22–24, 28, 31, 120).

Pendolino engaged in other offensive conduct directed at the plaintiff. On one occasion, in August 1991, Pendolino left a voice message on plaintiff's work pager saying "Alex called, he's got your underwear at the hotel, but don't worry, he'll hold onto them for you." Plaintiff unknowingly played the pager message in a crowded work elevator

---

1. Plaintiff's initial complaint raised eight separate causes of action. On April 14, 1997, summary judgment was granted to defendants on counts five, six, seven and eight. At trial, the parties stipulated that the only claims currently before the Court were: (1) plaintiff's Title VII claim under 42 U.S.C. § 2000e–2(a)(1), (2) plaintiff's claim under § 296 of the NYHRL, and (3) plaintiff's claim under § 1983 alleging violation of her rights under the Equal Protection Clause.

and was humiliated by it. On another occasion, plaintiff testified that she heard Pendolino unbuckle his belt and unzip his pants intimating that he intended to expose himself to plaintiff (Tr. at 60–61, 70–71).

Plaintiff testified that she asked Pendolino to stop his offensive behavior, but that her complaints caused him to engage in his "routine" more frequently. Sometime in early 1991, plaintiff complained about Pendolino to his immediate supervisor, Antoinette Klimenczko. Klimenczko said that "Joe [Pendolino] will be Joe," but that she would speak to him about his behavior. After plaintiff complained, Pendolino's behavior grew more vulgar and the harassment occurred more frequently (Tr. at 32–36).

Plaintiff further testified that she was a "nervous wreck" as a result of Pendolino's conduct. She said she experienced emotional duress, which caused her to break out in hives, and she experienced shortness of breath and chest pains. She also felt "exhausted" all of the time and claims that Pendolino's behavior adversely affected her home life. At work, plaintiff did everything she could to avoid Pendolino, including altering her work schedule, to limit her contact with him, and taking refuge in the ladies room while he was around (Tr. at 36–38).

Pendolino's harassing behavior continued throughout 1991. Plaintiff testified that in late 1991, she complained to Margaret Burke, who at the time held the position of Principal Auditor. Margaret Burke was Antoinette Klimenczko's immediate supervisor and two supervisory levels above Pendolino. Burke's immediate supervisor was Richard Pawarski, the City Auditor. Plaintiff testified that she would go in to Burke's office almost daily and "cry" about Pendolino's conduct toward her. Although Burke appeared to sympathize with plaintiff, Burke told plaintiff that there was "nothing she could do" about Pendolino's behavior (Tr. at 44–47).

Plaintiff testified about an incident that occurred at the water garage in December 1991. As part of her duties as Audit Inspector, plaintiff was required to "go into the field" and inspect the work being performed for the City. One day, in December 1991, plaintiff was told that Pendolino would accompany her on her inspection. Plaintiff claims that she went to Al Renzoni, who had replaced Klimenczko as Pendolino's supervisor sometime in November or December 1991, and asked Renzoni not to send Pendolino into the field with her. According to plaintiff, Renzoni replied that "[Pendolino] could make your life hell, just let him go with you." Plaintiff reluctantly did so. Plaintiff testified that during the inspection, Pendolino said "suck my dick" either to plaintiff or a man named Al Hoffman who was also there. This comment was made in front of several other people. When plaintiff returned from the inspection, she told Renzoni what had occurred. Renzoni promised her that she would never have to go on an inspection with Pendolino again. Despite Renzoni's assurances to the contrary, Pendolino appeared at plaintiff's inspection site the very next day. Plaintiff complained to Renzoni on several occasions. She noted that Pendolino's conduct only got worse after she complained to Renzoni (Tr. at 50–56).

In December 1991, or January 1992, plaintiff approached Richard Pawarski, the City Auditor, about Pendolino's offensive conduct. She told Pawarski that Pendolino was making obscene sexual gestures toward her. However, plaintiff did not recall whether she specifically relayed the water garage incident to Pawarski (Tr. at 121).

In January 1992, plaintiff told Paul De-Franks, the Payroll Audit Inspector and a union officer, that she wanted to file a union grievance against Pendolino. Paul De-Franks set up a meeting with Richard Pawarski to address the matter. A meeting took place in Pawarski's office in February 1992 (the "February 1992 meeting"), and was attended by Pawarski, Pendolino, DeFranks, Margaret Burke, plaintiff and the four other Audit Inspectors that Pendolino supervised.[2] During the meeting, plaintiff and her fellow Audit Inspectors described Pendolino's offensive behavior. Plaintiff recounted that Pawarski stopped the meeting after observing Pendolino "smirking," and told Pendolino

---

2. Plaintiff was the only female among the five Audit Inspectors Pendolino supervised.

that he was in "big trouble" if the allegations are true (Tr. at 42, 126, 138–39, 186).

Immediately after concluding the February 1992 meeting, Pawarski brought the matter to the attention of his supervisors, Joel Giambra, the City Comptroller, and R. Michael McNamara, then Deputy Comptroller. Disciplinary charges were filed against Pendolino on February 26, 1992 (Pl.Ex.1). On March 13, 1992, Giambra sent a letter to Pendolino informing him that "this office viewed the charge[s] and specifications as having merit." This view was "based upon the willingness and availability of a sizeable number of fellow employees that offered to testify as to the accuracy of the charge[s] [against Pendolino] . . . "(Pl.Ex.3). As a result, a decision was made to discipline Pendolino. Pendolino's discipline consisted of: (1) a three day suspension without pay; (2) moving him away from plaintiff's immediate working area (Room 1214) to an area in front of Pawarski's office (Room 1230); (3) removing Pendolino's telephone access so he could not place any more obscene pages; and (4) restricting Pendolino from going out in the field on inspections until further notice (Tr. at 134–37, 424). It is also alleged that Pendolino's discipline included the withholding of his automobile allowance.

Plaintiff was unsatisfied with this discipline for several reasons. First, although Pendolino was moved out of Room 1214, where plaintiff's desk was located, he was placed in Room 1230, an area that plaintiff needed to enter daily. As a result, she still ran into Pendolino frequently. Additionally, despite the change in location, Pendolino retained supervisory authority over plaintiff, and was still responsible for reviewing her work. Moreover, although Pawarski forbid Pendolino from entering plaintiff's working area, Room 1214, Pendolino did so on numerous occasions. When he did, he would make comments like "oh, I guess I'm not supposed to be here." Each time, plaintiff complained to Pawarski who assured her it would not happen again. Plaintiff testified that she was upset by this and felt as if Pendolino had

"gotten away" with the sexual harassment (Tr. at 92–93).

Plaintiff was also dissatisfied with Pendolino's punishment because she learned that the letter of reprimand was never placed in Pendolino's permanent civil service file. This happened even after repeated assurances by Giambra that the letter would be placed in Pendolino's file. Defendant's own witness, Barbara Slominski, testified that the collective bargaining agreement required that the findings of a disciplinary hearing be placed in the employee's civil service file. Plaintiff stated that she repeatedly asked Giambra why the letter evidencing disciplinary action was not placed in Pendolino's file. Giambra merely responded that "he was not aware of that" (Tr. at 88–91, 324, 326–27; *see also* Tr. at 435). The letter of reprimand was finally placed in Pendolino's civil service file in November 1992, after plaintiff filed a complaint with the State Division of Human Rights (Tr. at 91).

Generally speaking, Pendolino's offensive behavior ceased after he was moved to Room 1230. However, on at least one occasion sometime in late February or early March 1993, Plaintiff ran into Pendolino while she was signing out. Pendolino approached Plaintiff, put his arm around her and gestured toward her breasts. Plaintiff was upset about this incident and told Paul De-Franks. DeFranks apparently informed Giambra about the incident (Tr. at 98–100).

On March 24, 1993, plaintiff received a memorandum from Pawarski indicating that, effective the following day, Pendolino was being moved back into Room 1214 to resume his duties supervising the Audit Inspectors (Pl.Ex.11). Plaintiff testified that when Pendolino returned, he continued making offensive gestures, although they were not directed at her. Additionally, Pendolino continued to have supervisory authority over plaintiff, but he was not permitted to accompany her out on inspections. Plaintiff was required to again deal with Pendolino when she had work-related problems.[3]

---

**3.** In the interim, from March 1992 to March 1993, while Pendolino was being disciplined, plaintiff was instructed to have Richard Pawarski

or Margaret Burke help her with any work-related problems (*See* Pl.Ex. 11).

On or about July 1, 1994, plaintiff was reassigned to work in the police garage and relieved from her position as Audit Inspector.[4] However, later that month, Pendolino was sent to work with plaintiff at the police garage for two weeks (Tr. at 105, 110, 130).

Plaintiff's testimony was corroborated by several other witnesses. Harry Stahl, a fellow Audit Inspector, testified that he also observed Pendolino engage in sexually harassing behavior. Stahl testified that he observed Pendolino make offensive sexual gestures toward plaintiff on numerous occasions. Stahl heard Pendolino make comments like "boobs for brains" or "tits for brains" when referring to plaintiff. He was also on the elevator when plaintiff received the offensive message from Pendolino over her pager (Tr. at 170–74, 185).

Stahl testified that he and several other Audit Inspectors, including plaintiff, complained to Antoinette Klimenczko about Pendolino's harassing conduct on several occasions before the February 1992 meeting, but that Klimenczko merely replied, "Joe's that way." Stahl himself also mentioned the offensive conduct to Margaret Burke several times. Burke replied that she would "try" to do something about it, but did not believe her efforts would be successful. In addition, Stahl claims that he and several of the other Audit Inspectors met with Pawarski "informally" over breakfast on at least one occasion to discuss Pendolino's offensive behavior (Tr. at 176–79).

Plaintiff's testimony regarding Pendolino's harassing behavior was also corroborated by Al Renzoni, who testified as a rebuttal witness for plaintiff. Renzoni testified that plaintiff complained to him about Pendolino's harassing behavior, but that he told plaintiff that he does not become involved in "personnel matters." However, Renzoni stated that he personally brought the matter to R. Michael McNamara, the Deputy Comptroller,

sometime in December 1991. According to Renzoni, McNamara replied "[w]e'll take care of it. It's not your concern. Thank you for advising me of this" (Tr. at 476–78).

Defendant called five witnesses to testify on its behalf: Richard Pawarski,[5] Barbara Slominski, R. Michael McNamara, Warren Galloway and Joel Giambra. As noted, Pawarski testified that he first learned of Pendolino's conduct toward plaintiff at the February 1992 meeting, but acknowledged that Pendolino was difficult to supervise and indicated he was aware of this prior to the meeting.[6] He claims that he took prompt action by reporting the matter to McNamara and Giambra immediately upon learning of Pendolino's behavior. Pawarski claims that he was opposed to the idea of returning Pendolino to plaintiff's work area, in March 1992, but the matter was "out of his hands." According to Pawarski, Pendolino was returned primarily because he was being under utilized during his disciplinary period. As such, the City felt that the interests of efficiency dictated that Pendolino should be returned to his supervisory role (Tr. at 218–19, 237, 245–47, 288).

Pawarski corroborated Stahl's testimony regarding the "informal" breakfast meetings with several Audit Inspectors to discuss Pendolino's behavior. Pawarski claims that he understood the purpose of the meeting to be a discussion of how to limit the Audit Inspectors' exposure to Pendolino. However, Pawarski denies being apprised of any behavior that could be characterized as sexual harassment (Tr. at 269–71). Pawarski's testimony in this regard contradicts the testimony of plaintiff and Harry Stahl, who testified that they did inform Pawarski of Pendolino's harassing behavior during the informal breakfast meetings. In light of the consistency and credibility of both plaintiff's and Stahl's testimony, the Court finds that Pawarski was informed of Pendolino's harassing conduct

---

**4.** Plaintiff's position as Audit Inspector was a temporary assignment. In order for her and the other Audit Inspectors to maintain the position on a permanent basis, they were required to take an examination. The reassignment occurred as a result of plaintiff's failure to score high enough on the examination.

**5.** Pawarski was also called to testify by plaintiff on her behalf.

**6.** Pawarski also admitted having observed Pendolino belittle his co-workers and use the "F word" on numerous occasions when referring to his subordinates and others.

during the informal breakfast meetings in December 1991 or January 1992.

Pawarski also corroborated plaintiff's testimony that Pendolino wandered away from his designated work area in Room 2130, despite the fact that he was prohibited from doing so. Pawarski claims that when he learned of Pendolino's transgressions, he "read him the riot act." Pawarski said he had to do this on several occasions. Pawarski further testified that he informed McNamara several times of Pendolino's failure to stay at his desk as ordered (Tr. at 282–83, 289–91).

McNamara testified that he was the City's Deputy Comptroller from October 1980 until September 1996. During that time he oversaw most personnel matters in the Comptroller's office. McNamara said he first learned of Pendolino's harassment on the day of the February 1992 meeting (Tr. at 338–42, 374–75). This testimony is contradicted by the testimony of Al Renzoni, who testified that in December 1991 he informed McNamara that Pendolino was sexually harassing plaintiff (Tr. at 477–78, 485). The Court credits the testimony of Al Renzoni in this regard, finding that Renzoni did specifically inform McNamara of Pendolino's offensive conduct in 1991. McNamara also denied being apprised by Pawarski that Pendolino was wandering away from his desk. Notwithstanding McNamara's testimony to the contrary, the Court finds that Pawarski did inform McNamara about Pendolino's wandering on several occasions. McNamara admitted having several conversations with Margaret Burke regarding Pendolino prior to February 1992. However, according to McNamara, the discussion related generally to Pendolino's "bad attitude" and did not involve any discussion of Pendolino's harassing behavior (Tr. at 384). McNamara also stated that he personally spoke to Pendolino at least 20–30 times during the 1992–93 disciplinary period about Pendolino's attitude, tardiness and absenteeism.

With regard to the disciplinary decision, both Giambra and McNamara testified that Giambra wanted Pendolino terminated for his behavior. An informal hearing on Pendolino's disciplinary charges was held on March 11, 1992. McNamara attended the meeting, along with Paul DeFranks, Pendolino and Michael McKeating, an attorney for the City. According to McNamara, he informed McKeating that Giambra wanted Pendolino fired, but McKeating advised the City that such a penalty would not be upheld, in part because the union fought aggressively on Pendolino's behalf. After some discussion, McKeating advised the City that a 3–day suspension was an appropriate sanction, and McNamara and DeFranks agreed (Tr. at 347–48, 377–78, 422, 425–26).

The City admits that it did not have a sexual harassment policy until a policy was adopted in April 1992 (Pl.Ex.7). While the policy set forth several approaches to complaint resolution, it did not contain a written procedure for making complaints (See Pl.Ex. 7, at 3). Furthermore, no sexual harassment training was instituted until April 1993. Once training was instituted, it was limited to the Comptroller's office (See Tr. at 407–08). The evidence suggests that Giambra contacted Warren Galloway at the New York State Division of Labor in February or March 1992, for advice on how to handle the alleged sexual harassment by Pendolino (Tr. at 428). Galloway testified that he advised Giambra to investigate the matter thoroughly, and to conduct training on sexual harassment. Galloway directed Giambra to contact his office supervisor in writing to request sexual harassment training. According to Galloway, it usually takes four to five months after a formal request was made before training was conducted (Tr. at 400–405).

Both Giambra and McNamara were involved in the decision to return Pendolino to plaintiff's work area in Room 1214. They admitted doing so primarily because Pendolino was being under utilized during the disciplinary period, even though he was still receiving a supervisor's salary. They believed that returning him to plaintiff's work area would not be problematic for plaintiff because she would not need to work directly with Pendolino, although she would be seated in his direct line of vision approximately 10 feet away, and because Pendolino would continue to be under "careful scrutiny" after the move (Tr. at 351–54, 427–28). Notwithstand-

ing this "careful scrutiny," the evidence at trial demonstrated that Pendolino was subsequently brought up on charges for sexually harassing another employee. Those charges ultimately led to Pendolino's resignation in December 1995.

## DISCUSSION

### I. Sexual Harassment under Title VII and NYHRL.[7]

Title VII prohibits discrimination on the basis of race and sex with respect to the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). Courts and commentators have generally divided sexual harassment cases into two separate theories: (1) quid pro quo; and (2) hostile work environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Plaintiff is proceeding under the latter theory.

 Until recently, the law required that a plaintiff proceeding under a hostile work environment claim establish (1) that she was subjected to a hostile work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995). To prove hostile work environment, plaintiff must show that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment." *Torres v. Pisano*, 116 F.3d 625, 630–31 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997) (internal quotations omitted). Plaintiff must also show that some "some specific basis [exists] to hold the employer liable for the conduct of its employees." *Id.* at 633. The Supreme Court has declined to establish a definitive rule on employer liability in hostile work environment cases. *Meritor Savings Bank v. Vinson*, 477 U.S. at 57, 106 S.Ct. 2399. Instead, lower courts must look to common

law agency principles in determining whether liability attaches. *Id.* at 72, 106 S.Ct. 2399.

 The Supreme Court recently built upon the principles established in *Meritor* by indicating that employers are subject to vicarious liability for the sexual harassment of an employee by a supervisor. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). However, when no "tangible employment action," is taken against the employee, *i.e.*, discharge, demotion or undesirable reassignment, the employer can escape liability by establishing an affirmative defense showing that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and by showing that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at ——, 118 S.Ct. at 2293; *Burlington Indus.*, 524 U.S. at ——, 118 S.Ct. at 2270. Both prongs of the affirmative defense are based on standards of reasonableness or negligence. However, no affirmative defense is available when the supervisor's harassment culminates in a tangible employment action.

### A. Hostile Work Environment

 Applying the principles of *Faragher* and *Burlington Industries* to plaintiff's allegations, the Court finds that Pendolino's conduct subjected plaintiff to a hostile work environment. Plaintiff demonstrated that Pendolino engaged in offensive sexual harassment that included commenting about her breasts, making obscene gestures directed at her, repeatedly using vulgar and offensive language when speaking to her or others in her presence, and leaving inappropriate and embarrassing messages over her work pager. In light of this evidence, there is no doubt that plaintiff's workplace was "per-

---

7. As already stated, plaintiff brings this action under Title VII and NYHRL § 296. Because discrimination claims brought under NYHRL are treated in an identical manner as those brought under Title VII, it is sufficient to analyze of

plaintiff's claims under Title VII for the purposes of both statutes. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir.1996); *Fierro v. Saks Fifth Avenue*, 13 F.Supp.2d 481, 487 (S.D.N.Y. 1998).

meated with discriminatory intimidation, ridicule, and insult." *Torres,* 116 F.3d at 630–31.

■ Plaintiff also established that Pendolino's conduct was "sufficiently severe and pervasive enough to alter the conditions of [her] employment." *See Torres,* 116 F.3d at 630–31. Plaintiff testified that Pendolino's harassing behavior started at the end of 1990 and continued—becoming increasingly more offensive and hostile as time went on—until the February 1992 meeting. Plaintiff was so upset by Pendolino's conduct that she did everything she could to avoid him, including taking refuge in the ladies room or at another employee's work station, and altering her work schedule so as to minimize contact with him (Tr. at 118, 139). Moreover, plaintiff demonstrated that Pendolino's conduct was pervasive enough to be noticed by other employees and supervisors.

## B. Affirmative Defense.

Since plaintiff established that she was subjected to a hostile work environment by her supervisor, Joseph Pendolino, the City will be vicariously liable for his actions unless defendant can establish the affirmative defense articulated in *Faragher* and *Burlington Industries.* "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at ——, 118 S.Ct. at 2293; *Burlington Indus.,* 524 U.S. at ——, 118 S.Ct. at 2270.

## 1. Reasonable Care to Prevent and Correct Sexual Harassment.

■ The first part of the affirmative defense contains two components that must be fulfilled by the defendant: the defendant must take reasonable care to prevent sexual harassment, and the defendant must take reasonable care to correct promptly sexual harassment. As to both components, I find that the City has failed to meet its burden.

### a. Reasonable care to prevent sexual harassment.

Defendant does not dispute plaintiff's contention that Pendolino's harassing behavior occurred over one year before any action was taken (*See* Item 37, at 3). Nor does defendant challenge plaintiff's testimony that she repeatedly complained to Pendolino's immediate supervisor, Antoinette Klimenczko, and Klimenczko's supervisor, Margaret Burke. In addition, the evidence shows that plaintiff was in Burke's office almost daily complaining to Burke about Pendolino's harassment. Defendant also concedes that no anti-harassment policy existed at the time plaintiff was being harassed. Nor did the City conduct any mandatory anti-harassment training until more than one year after Pendolino admitted to the harassment and more than two and one-half years after the harassment first began.

Based on this record, the Court finds as a matter of fact that defendant failed to take reasonable care to prevent Pendolino's harassing behavior. *See Harrison v. Eddy Potash, Inc.,* 158 F.3d 1371, 1377 (10th Cir.1998) (finding that employer can be liable when evidence shows employer failed to exercise reasonable care in preventing and promptly correcting sexual harassment in the workplace even though employer had already established sexual harassment policy).

### b. Reasonable care to correct promptly sexual harassment.

The court also finds that defendant failed to take reasonable steps to correct Pendolino's harassing behavior upon learning of it. *See id.; see also Fall v. Indiana Univ. Bd. of Trustees,* 12 F.Supp.2d 870, 881 (N.D.Ind. 1998) (finding no triable issue of fact when employer had sexual harassment policy, and employer immediately launched an investigation into allegations of sexual harassment which resulted in harasser's resignation). The evidence shows that Klimenczko became aware of Pendolino's behavior in the spring of 1991 (Tr. at 116). Margaret Burke became aware of the sexual harassment in late 1991 (Tr. at 118). The evidence also shows that both Pawarski and Deputy Comptroller McNamara were personally apprised of Pen-

dolino's conduct in December 1991 or January 1992. Notwithstanding actual knowledge by those in supervisory positions, no action was taken until February of 1992, after plaintiff expressed her intent to file a union grievance.

■ When disciplinary action was ultimately taken, it was patently insufficient to remedy the harm. The employer has a duty to take prompt remedial action that is reasonably calculated to end the harassment once becoming aware of sexual harassment in the workplace. *Kopp v. Samaritan Health System, Inc.,* 13 F.3d 264, 269 (8th Cir.1993). What constitutes appropriate remedial action necessarily depends on the facts of the case—the severity and persistence of the harassment and the effectiveness of any initial remedial steps. *Torres,* 116 F.3d at 638; *Garcia v. Elf Atochem N. Am.,* 28 F.3d 446, 451 (5th Cir.1994), *abrogated on other grounds,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Given the facts of this case, the disciplinary action taken against Pendolino was clearly insufficient. Addressing first the three day suspension, this penalty was insignificant when compared to the period of harassment endured by plaintiff and the persistent, degrading and clearly inappropriate conduct engaged in by Pendolino. Plaintiff correctly characterized this penalty as a slap on the wrist.

Moreover, the record suggests that Pendolino was not actually financially penalized during this period. According to plaintiff's proof, during the suspension period Pendolino took home two checks in the amounts of $1,108.254 and $258.17 (Pl Ex. 5). Pendolino was netting $442.22 during prior pay periods. In addition, Pendolino received a third paycheck, out of cycle of the normal pay period, in the amount of $782.61 one week after receiving the other two checks. During the next three pay periods Pendolino received paychecks netting $325.53. The City did not put forth any evidence explaining these paychecks. The inference argued by the plaintiff, that Pendolino was not penalized, remains unrefuted.

Finally, the three day suspension completely failed to deter Pendolino from engaging in further sexual harassment. The evidence shows that Pendolino continued to engage in harassing activities after he was disciplined. In fact, it was subsequent charges of sexual harassment that ultimately led to his resignation in 1995. *See Garcia,* 28 F.3d at 451.

According to the City, a second component of the disciplinary action was a change in Pendolino's work station and job assignment. However, this penalty was likewise ineffective. Pendolino was merely moved down the hall. He remained in the same department, on the same floor, and in a location that plaintiff needed to frequent every day in order to sign in.

Furthermore, Pendolino openly defied the direction that he refrain from entering plaintiff's work area. He came into plaintiff's work area on many occasions, flaunting the restriction with comments such as, "Oh, I guess I'm not supposed to be here." Plaintiff repeatedly informed Pawarski of Pendolino's transgressions, and Pawarski informed McNamara, but no further disciplinary action was ever taken. Obviously, neither the City nor Pendolino took the disciplinary action seriously. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459 (9th Cir.1994) (finding that employer failed to take prompt remedial action where evidence showed that harasser circumvented action taken by employer by showing up early for his shift so as to harass plaintiff).

Despite the change in Pendolino's physical location, I find that he retained supervisory authority over plaintiff throughout the term of his discipline (*See* Tr. at 279). It is true that plaintiff was instructed to bring any work-related problems to Burke or Pawarski directly, and that Pendolino was not allowed to accompany her in the field. However, Pendolino was still required to approve all of her work orders during this period. This provided Pendolino with the opportunity to further harass plaintiff by delaying approval of her work orders. Perhaps most egregious, however, was defendant's decision to return Pendolino back to plaintiff's work area, particularly given that another incident of harassment occurred just a few weeks

prior to the reassignment. *See Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 199 (5th Cir.1992) (forcing plaintiff to work under supervision of a known sexual harasser created abusive work environment).

Defendant also contends that Pendolino was punished by removing his car allowance, by placing a letter of reprimand in Pendolino's file, and by removing the telephone from Pendolino's desk. Again, these so called penalties were either inconsequential or ineffective. Article XVI of the collective bargaining agreement grants city employees an automobile allowance for each day an employee has to use his or her personal vehicle on City business (*See* Def.Ex. 9, at Art. XVI). The purpose of the allowance is to reimburse employees for the use of their own vehicles on City business (Def.Ex. 9, at Art. XVI). By restricting Pendolino's activities to the office, there was no need to reimburse him for the use of his own vehicle. Accordingly, he was not being denied any benefit that he was entitled to receive because his work assignment did not involve any activities outside the office.

In addition, the City delayed filing Pendolino's letter of reprimand in his permanent Civil Service file. The collective bargaining agreement requires that a letter of reprimand be filed with the Municipal Civil Service Commission (Tr. at 324–25; Def.Ex. 9, at Art XX(20.3)(D)). The evidence shows that a disciplinary hearing was held in March 1992, but that the letter was not filed until November 1992, only after multiple requests by the plaintiff and only after plaintiff brought her grievance to the State Division of Human Rights (Tr. at 88–91; *see also* Pl.Ex. 8).

Finally, defendant points to the creation of a city-wide harassment policy as evidence of their response to Pendolino's behavior (*See* Def.Ex. 2). The City's harassment policy was disseminated to all department heads on March 19, 1992, and went into effect on April 1, 1992. While the court appreciates the City's efforts in creating this policy, the court finds that it was insufficient to relieve the City of responsibility for correcting Pendolino's harassing behavior. *See Harrison,* 158 F.3d at 1377. The policy was created just weeks after the February meeting, and more than a year after plaintiff first voiced her complaints about Pendolino's behavior to Pendolino's supervisors. In addition, the policy does not contain any procedures for reporting or investigating complaints of sexual harassment. *See* 29 C.F.R. § 1604.11(f); *see also Coates v. Sundor Brands, Inc.,* 160 F.3d 688, 696 (11th Cir.1998) (sexual harassment policy allows any employee to contact their line manager, personnel contact, or any other manager with whom they feel comfortable, and instructs the manager to take immediate action); *Duran v. Flagstar Corp.,* 17 F .Supp.2d 1195, 1203 (D.Colo.1998) (sexual harassment policy permits reporting sexual harassment through a broad range of channels, including any manager, a Human Resources representative, and a 1–800 telephone number).

For all of these reasons, I find that the City failed to exercise reasonable care to prevent and correct promptly sexual harassment.

### 2. Unreasonable Conduct by Plaintiff.

■ The City has also failed to establish the second element of the affirmative defense. Other than showing that Giambra, Pawarski and McNamara had "open door" policies, the City failed to demonstrate that it provided plaintiff *any* preventive or corrective opportunities to avoid harm. Indeed, despite the complete absence of any antiharassment policy, plaintiff personally complained to at least three supervisors—Klimenczko, Renzoni and Burke—each of whom failed to take any action. Instead, plaintiff's complaints were dismissed with comments like "the matter is out of [my] hands," "that's just Joe being Joe," "there's nothing I can do" and "I don't get involved in personnel matters" (Tr. at 35, 45, 178, 477). Other courts have found similar conduct sufficient to impose liability upon an employer. *See e.g. Varner v. National Super Mkts., Inc.,* 94 F.3d 1209 (8th Cir.1996), *cert. denied,* 519 U.S. 1110, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997) (finding employer failed to take appropriate action when, upon being informed that coworker grabbed employee's breasts, em-

ployer responded "that's just [harasser] being himself").

The City argues that the collective bargaining agreement provided a reasonable avenue for plaintiff to grieve her sexual harassment complaint and that her failure to do so at an earlier date shows that she failed to take advantage of reasonable opportunities to avoid harm (Item 37, at 10). There are several problems with this argument. First, it is not clear from the trial record that the City's grievance procedure under its union contract is the type of complaint procedure which the Supreme Court contemplated as a reasonable mechanism to avoid damages arising out of sexual harassment. As to the second prong of the affirmative defense, the Supreme Court in *Faragher* stated:

> The requirement to show that the employee has failed in a coordinate duty to avoid or mitigate harm reflects an equally obvious policy imported from the general theory of damages, that a victim has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages" that result from violations of the statute. *An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense.*

524 U.S. at ——, 118 S.Ct. at 2292 (internal citations omitted) (emphasis added).

The union contract entered into evidence does not contain any explicit or express mechanism for reporting or resolving complaints of sexual harassment. It only states that the provisions of the collective bargaining agreement, which relate to wage and benefits, "shall be applied equally to all employees of the bargaining unit without discrimination as to age, sex, marital status, race, color, creed, national origin, or political affiliation" (Def.Ex.9, Art. II). This anti-discrimination clause does not even mention sexual harassment, let alone provide any of the protective mechanisms contemplated by a more effective sexual harassment policy. *See*

*Coates,* 160 F.3d at 696; *Duran,* 17 F.Supp.2d at 1203. The cases cited by the defendant in support of its argument ·as to this issue are simply not on point.

The second problem with this argument is that the trial record quite clearly supports a finding that the plaintiff "used reasonable care under the circumstances to avoid or minimize the damages." As already noted, plaintiff complained to several supervisors about Pendolino's conduct (Tr. at 29–36, 44–46, 51, 55–56). Rather than intervening on plaintiff's behalf, or instructing her to file a grievance under the union contract, the supervisors dismissed her complaints. Plaintiff finally did complain to the union, but only after her other complaints were ignored. On these facts, the plaintiff cannot be faulted for failing to go the union at an earlier date. *See Speight v. Albano Cleaners, Inc.,* 21 F.Supp.2d 560, 564 (E.D.Va.1998).

The final problem with the City's argument is that the union contract allows employees to file grievances orally with an immediate supervisor (Def.Ex.9, Art. 19.1). Plaintiff's complaints to her immediate supervisors fit within these guidelines, and should reasonably be viewed as oral grievances.

Considering the record as a whole, and keeping in mind that the burden of proving plaintiff's negligence falls on the City, I find that the City has failed to establish that plaintiff acted unreasonably in failing to take advantage of preventive or corrective opportunities to avoid harm.

## II. Equal Protection Claim.

█ Plaintiff also seeks relief under § 1983 for violation of her rights under the Equal Protection Clause.[8] Sexual harassment of a female employee by a state employer may constitute sex discrimination for purposes of the Equal Protection Clause of the Fourteenth Amendment. *Annis v. County of Westchester,* 36 F.3d 251, 254 (2d Cir.1994); *see also Bohen v. City of East Chicago,* 799 F.2d 1180, 1185 (7th Cir.1986).

---

8. As an initial matter, the Court notes that "[a] Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action, so long as

the § 1983 claim is based upon a distinct violation of a constitutional right." *Gierlinger v. New York State Police,* 15 F.3d 32, 34 (2d Cir.1994).

## A. Elements of Equal Protection Claim.

██ "[A]n equal protection violation under § 1983 based on [hostile environment] sexual harassment ... occurs when (1) the plaintiff was subject to intentional harassment, (2) based on sex, (3) under color of state law, and (4) sufficiently extensive to render the ... environment hostile to a plaintiff." *Cohen v. Litt,* 906 F.Supp. 957, 964 (S.D.N.Y.1995) (adapting Second Circuit elements of Title VII hostile work environment claim to § 1983 equal protection claim of sexual harassment). To sustain an equal protection claim of sexual harassment, a plaintiff must show both "sexual harassment" and an "intent" to harass based upon plaintiff's membership in a particular class of citizens. *Trautvetter v. Quick,* 916 F.2d 1140 (7th Cir.1990). The "harassment" prong is met by showing actionable harassment under Title VII. *Id.* at 1149. The "intent" prong requires proof that the defendant's discriminatory conduct was intentional; the conduct was based on the plaintiff's status as a male or female, rather than some other personal characteristic. *Id.* at 1150.

██ For reasons previously stated, I find that plaintiff was subject to "harassment" actionable under Title VII. I also find that the harassment suffered by plaintiff was incurred "because of" her gender as a female and not because of characteristics personal to her.[9] Accordingly, plaintiff has established the elements for her § 1983 claim.

## B. Liability of a Municipal Entity under § 1983.

██ Unlike Title VII liability, a theory of *respondeat superior* cannot be used to hold a municipality liable under § 1983. *Wise v. New York City Police Dep't.,* 928 F.Supp. 355, 364 (S.D.N.Y.1996) (citing *Monell v. Dep't of Soc. Servs. of the City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Plaintiff must show that the violation of her constitutional rights resulted from a municipal custom or policy in order to hold a municipality liable for the unconstitutional acts of an employee below the policymaking

level. *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1335, 137 L.Ed.2d 494 (1997). "The policy or custom need not be memorialized in a specific rule or regulation." *Id.* However, "[b]efore the actions of subordinate [municipal] employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992).

██ Municipal liability may also be proven by the existence of "circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within the jurisdiction." *Kern,* 93 F.3d at 44. To constitute deliberate indifference to the constitutional rights of its citizens, a municipality's failure to train or supervise must meet three requirements:

> First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.

> Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.

> Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. Thus, municipal policymakers may appropriately concentrate training and supervision resources on those situations where employee misconduct is likely to deprive citizens of constitutional rights.

*Walker v. City of New York,* 974 F.2d 293, 297 (2d Cir.1992). When the plaintiff establishes all three elements, "it can be said with confidence that the policymaker should have known that inadequate training or supervi-

---

9. Defendant does not seem to dispute that Pendolino intended to harass plaintiff because of her gender.

sion was 'so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* (quoting *City of Canton*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

▮ I find that plaintiff has established that Pendolino's discriminatory conduct was so "persistent and widespread" as to constitute a custom within the City. Plaintiff demonstrated that Pendolino's harassing conduct toward herself and others was pervasive enough to be observed by his supervisor and numerous others in the Comptroller's Office. The facts show that both Pawarski and Deputy Commissioner McNamara were personally informed of Pendolino's harassing conduct, but failed to take any action. Despite plaintiff's repeated complaints to progressively higher supervisory personnel, it was not until after plaintiff sought to file a union grievance that any action was taken. Given this evidence, I find that Pendolino's discriminatory conduct was so manifest as to imply the constructive acquiescence of senior policymaking officials. *Sorlucco*, 971 F.2d at 871; *cf. Kern v. City of Rochester*, 93 F.3d at 44 (holding municipal liability could not be established where there was no indication that either the City or the harasser's superiors were aware of his discriminatory conduct).

### III. Damages.

Having found the City liable to plaintiff under Title VII, NYHRL § 296 and § 1983, I now turn to the issue of damages. At the outset, plaintiff is not entitled to punitive damages against a municipality under any of these provisions. *See* 42 U.S.C. § 1981a(b)(1). Therefore, plaintiff's remedy is limited to compensatory damages, including damages for emotional suffering. *See Bayard v. Riccitelli*, 952 F.Supp. 977, 988–89 (E.D.N.Y.1997); *Walz v. Town of Smithtown*, 46 F.3d 162, 169 (2d Cir.1995), *cert. denied*, 515 U.S. 1131, 115 S.Ct. 2557, 132 L.Ed.2d 810 (1995).[10]

The purpose of compensatory damages is to compensate the injured parties for only the injury sustained in order to "make good or replace the loss caused by the wrong or injury." *McMillian v. F.D.I.C.*, 81 F.3d 1041, 1055 (11th Cir.1996) (internal citations omitted); *Reese v. United States*, 24 F.3d 228, 231 (Fed.Cir.1994). Simply put, compensatory damages make the injured party whole. *See McMillian*, 81 F.3d at 1055; *see also Reynolds v. Pegler*, 123 F.Supp. 36, 38 (S.D.N.Y.1954), *aff'd*, 223 F.2d 429 (2d Cir. 1955). Plaintiff does not allege that she lost any wages as a result of the harm she suffered. Nor does plaintiff seek to be compensated for the costs medical, psychological, or other treatment that she sought as a result of Pendolino's harassing behavior.

▮ In determining an appropriate award for plaintiff, I recognize that she experienced Pendolino's harassment for over one year. There were several incidents where plaintiff was publicly humiliated, including the incident in the elevator and the incident in the water garage. As a result of this treatment, plaintiff suffered emotional distress. Although she did not seek medical treatment, plaintiff testified that she suffered physical manifestations of nervousness and emotional distress, including tearfulness, chest pains, shortness of breath and feelings of exhaustion. Plaintiff testified that Pendolino's harassment adversely affected her relationship with her husband. However, plaintiff did not produce any medical evidence of her emotional distress nor did she seek psychiatric or psychological treatment.

In determining the amount of compensatory damages to award in this case, it is appropriate to consider the range of verdicts in other cases. For example, jury awards of $85,000 and $65,000 for pain and suffering and mental anguish have been upheld. *See Perdue v. City Univ. of New York*, 13 F.Supp.2d 326, 337 (E.D.N.Y.1998); *Anderson v. YARP Restaurant, Inc.*, No. 94

---

**10.** Although not raised by any of the parties, the Court notes that plaintiff is not entitled to compensatory damages under the Civil Rights Act of 1991 for discriminatory conduct that occurred prior to the November 21, 1991. *See Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483,

128 L.Ed.2d 229 (1994); *Flower v. Mayfair Joint Venture*, No. 95 CIV. 1744(DAB), 1996 WL 239997 (S.D.N.Y.1996). However, plaintiff is entitled to damages under the NYHRL and § 1983 for injuries that occurred prior to November 21, 1991.

827

Civ. 7543, 1997 WL 27043 (S.D.N.Y. Jan.23, 1997). In a claim based on the Age Discrimination in Employment Act, a jury's award of $35,000 in compensatory damages was found to fall "toward the low end of the range of awards deemed 'reasonable' by other district courts." *Mahoney v. Canada Dry Bottling Co. of New York/Coors Dist. Co. of New York,* No. 94–CV–2924, 1998 WL 231082, at *6 (E.D.N.Y. May 7, 1998). The plaintiff in Mahoney had difficulty sleeping for two to three months after he was not promoted to a management position. *Id.* at * 5.

On the other hand, an award of $250,000 was found to be excessive even though the court found support for plaintiff's claim of mental anguish. *Bronx Cross County Medical Group, P.C. v. Lassen,* 233 A.D.2d 234, 650 N.Y.S.2d 113, 114 (1996). The plaintiff's compensatory damages award was subsequently reduced to $25,000. *Id.* Similarly, in *Town of Lumberland v. New York State Div. of Human Rights,* a $150,000 compensatory damage award for emotional distress and humiliation was reduced to $20,000. 229 A.D.2d 631, 644 N.Y.S.2d 864, 870 (1996). The plaintiff testified that she was upset, humiliated, embarrassed, and that she had one visit with a physician for her depression. *Id.* An award of $20,000 was found to be consistent with awards for comparable injuries. *Id.* Finally, an award of $20,000 for mental anguish in an employment discrimination action was seen as excessive when the plaintiff testified that she "felt hurt," was generally irritable, and remained in bed and took over the counter medications for headaches and stomach distress. *Buffalo Athletic Club v. New York State Div. of Human Rights,* 672 N.Y.S.2d 210 (App.Div.1998). An award of $10,000 was seen as "consistent with awards for comparable injuries and proof of mental anguish made in similar cases." *Id.* at 211 (internal citations omitted).

Considering the evidence produced at trial and the range of verdicts in other cases, I find that $30,000 is an appropriate measure of damages for the emotional distress suffered by the plaintiff.

## CONCLUSION

For the foregoing reasons, the Clerk is directed to enter judgment in favor of the plaintiff against the defendant in the amount of $30,000.

**So Ordered.**