**Gaye NEWSOME, Plaintiff,**

v.

**ADMINISTRATIVE OFFICE OF THE COURTS OF THE STATE OF NEW JERSEY, William Coleman, Jr., Robert E. Battle and Phillip J. Hill, individually and as employees of Administrative Office of the Courts of the State of New Jersey, Defendants.**

No. Civ.A. 97–3213 (JAG).

United States District Court,
D. New Jersey.

July 5, 2000.

Francis Obi, Irvington, NJ, for plaintiff Gaye Newsome.

Douglass L. Derry, Senior Deputy Attorney General, Karen M. Griffin, Deputy Attorney General, Office of the Attorney General, R.J. Hughes Justice Complex, Trenton, NJ, for defendants Administrative Office of the Courts, Bobby E. Battle, and Phillip J. Hill.

Paulette Brown, Duane, Morris & Heckscher, LLP, Newark, NJ, for defendant William Coleman.

### AMENDED OPINION

GREENAWAY, District Judge.

Presently before the Court are defendants' motions for summary judgment. Plaintiff Gaye Newsome alleges that she was sexually harassed by her supervisor, defendant William Coleman, during her tenure at defendant Administrative Office of the Courts ("AOC"), in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* ("Title VII"), the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5–1 *et seq.* ("LAD"), and state tort law.[1] For the reasons discussed below, defendants' motions are granted in part and denied in part.

## FACTS

The pertinent facts, taken in the light most favorable to Newsome as the non-moving party, are as follows: Newsome met Coleman prior to her employment with the AOC. At that time, Coleman was an adjunct professor at Essex County Community College in Newark, New Jersey, and Newsome worked in the college's Offender Aid and Restoration Program. *See* Newsome 56.1 Statement ¶ 11. In 1993, Coleman encouraged her to apply for a position as a Community Development Specialist, a function akin to a social worker, with the AOC's Juvenile Intensive Supervision Program ("JISP"), where Coleman was the Regional Supervisor for the Northern Region. *See id.* at ¶ 12; Coleman Ex. A; Tr. of Oral Arg. at 25; AOC 56.1 Statement at ¶ 3. During her JISP interview, Coleman asked Newsome whether she was single, dating someone, or if she had any children. *See* Newsome Ex. X, Newsome Dep. at 75.[2] After the interview process, Newsome accepted an offer to join the JISP as a Community Development Specialist.

During the relevant time, Newsome reported to Coleman. Defendant Philip J. Hill was the Director of the JISP and the person to whom Coleman reported. Defendant Bobby E. Battle was the Chief of the AOC's Equal Employment Opportunity Office ("EEO/AA").[3]

In October 1993, soon after Newsome started at the JISP, Coleman offered to drive her to a meeting in Trenton. He arrived at Newsome's home early in the morning, well before the appointed hour. Newsome was already waiting outside for him. *See* Griffin Cert. Ex E, Newsome Dep. at 13.[4] On the drive to Trenton, Coleman told Newsome that the woman who had helped him that morning at McDonald's was "unattractive." *Id.* at 14.

1. Federal jurisdiction exists, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C. 2000e–5(f)(3). This Court may exercise supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367(a).

2. Newsome also alleges that her encounters with Coleman following her interview and preceding her employment with the AOC contributed to a hostile environment. Specifically, Newsome states that she saw Coleman in a laundromat and supermarket in the neighborhood where they both lived, *see* Newsome Ex. Z, Newsome Dep. at 80–83, and that he telephoned her at home to keep her posted on the status of her application and to inform her that she had been hired. *See* Newsome Ex. Y, Newsome Dep. at 79. At the laundromat, it is clear that they greeted each other, and that Newsome initiated conversation with Coleman concerning the status of her application. It further appears that Newsome greeted Coleman upon seeing him in the supermarket. *See* Newsome Ex. Z, Newsome Dep. at 83. Coleman's remarks during Newsome's interview are clearly relevant to the present inquiry. By contrast, the casual, random neighborhood encounters are simply not probative of the workplace environment, and this Court will not draw the unreasonable and unsupported inference, urged by Newsome, that these two encounters demonstrate that Coleman was stalking her. Newsome also contends that Coleman hugged her in the supermarket when she had gotten the job, *see* Newsome 56.1 Statement ¶ 17, a statement disputed by Coleman, and unsupported by the deposition testimony cross-referenced by Newsome. *See* Newsome Ex. Z, Newsome Dep. at 80–83. In the absence of record support, this Court cannot consider the allegation that Coleman hugged Newsome in the supermarket.

3. Battle was incorrectly named in the complaint as Robert E. Battle.

4. It appears that Newsome was deposed over two days, October 7, 1998 and January 6, 1999, and that the pagination of the transcript from the second day was not consecutive to the first transcript. The Certification of Karen M. Griffin appends excerpts from the October session at Exhibit E, and from the January session at Exhibit F. The excerpts of Newsome's deposition included in Newsome's submissions do not indicate the date on which the testimony was given.

That same day, Coleman told Newsome that he needed to call another JISP employee, and referred to her as one of his "little girl friends." *Id.* at 15.

At some point later in 1993, Coleman paged Newsome on a Saturday morning and asked her to meet him at a local diner to discuss a case. *See* Newsome 56.1 Statement ¶ 21; Newsome Ex. BB, Newsome Dep. at 63; Griffin Cert. Ex. E, Newsome Dep. at 16. Newsome informed Coleman that she was busy and planned to go running, but Coleman insisted that she meet him. *See* Griffin Cert. Ex. E, Newsome Dep. at 16. At the diner, Coleman spoke to Newsome about JISP cases assigned to staff members other than Newsome. *See id.;* Tr. of Oral Arg. at 25–26. Coleman's son was present at this meeting, during which Coleman made "inappropriate comments" that made Newsome uncomfortable. Newsome Ex. CC, Newsome Dep. at 64.

Later that day, Coleman appeared at a local park where Newsome was jogging. *See* Newsome Ex. FF, Newsome Dep. at 66.[5] Newsome noticed Coleman in the park when she "felt someone behind [her]." Newsome Ex. GG, Newsome Dep. at 71. They jogged together for a while in the park, during which time Coleman mentioned that his fiancée was overweight and that she (Coleman's fiancée) complained that Coleman hired women with large breasts. *See id.* When Newsome was in her car about to leave the park, Coleman came over to her car, leaned in the open window, and attempted to kiss her. *See* Newsome Ex. HH, Newsome Dep. at 73; Griffin Cert. Ex. E, Newsome Dep. at 18. Newsome turned her head away to avoid his advance. *See id.*

In November of 1993, while Newsome was working in the field, at a high school in Paterson, New Jersey, Coleman paged her and directed her to meet him at Inde-pendence High School in Newark. She arrived before Coleman. When Coleman arrived, he introduced Newsome to the staff and explained that he had brought Newsome there for a Thanksgiving festival. Newsome became uncomfortable when she realized that no other JISP staff members were present. *See* Griffin Cert. Ex. E, Newsome Dep. at 19. Following the function, while Newsome was speaking with a male high school employee, Coleman approached and asked the man "What are you doing talking to her? She's with me." *Id.* at 19–20.

Newsome states that during the time she was under Coleman's supervision, he "was always hugging." He would pull Newsome toward him "like he was squeezing [her] breasts into his chest." Newsome Ex. EE, Newsome Dep. at 89. Coleman would hug Newsome from time to time in the mornings, sometimes coming up behind her and massaging her shoulders. *See* Griffin Cert. Ex. E, Newsome Dep. at 20, 23.[6]

At one point, in 1994, while Newsome was speaking with Betsy Fermaintt, a JISP clerical employee, Coleman walked into the office and attempted to hug Newsome. Newsome pushed him off of her and walked away. A few days later, Newsome informed Coleman that she did not want him to touch her. He stopped for a period of time and then began again to touch, grab, and hold Newsome's hand. *See* Griffin Cert. Ex. E, Newsome Dep. at 22; Newsome Ex. TT, Fermaintt Dep. at 13.

At an AOC Christmas party in 1993 or 1994, Coleman came up behind Newsome and "touched her on the shoulders with both his hands, sort of like a massage," and asked Newsome to dance. Newsome Ex. QQ, Crawford Dep. at 22. That evening, an upset Newsome approached a co-worker, Wendell Crawford, and asked him

---

**5.** There is no evidence that Newsome had told Coleman where she intended to jog.

**6.** Newsome could not offer further specifics about the dates on which these incidents occurred.

to "hang around" and act like they were engaged in conversation because Newsome did not want to dance with Coleman. Newsome Ex. RR, Crawford Dep. at 25. Crawford testified that Newsome was upset and cried to him after the party because of Coleman. *See id.*

Newsome also states that Coleman made inappropriate remarks of a sexual nature at staff meetings. He commented about the body parts and physical appearance of other female staff members. He also commented that the noise a woman makes while sneezing correlates with the noise she makes during intercourse. *See* Griffin Cert. Ex. E, Newsome Dep. at 23–24; Newsome Ex. VV, Griggs Dep. at 27.

Defendants assert, and the record reflects, that from at least as early as January 1985, the AOC had anti-harassment policies in place. The AOC anti-harassment manuals note that sexual harassment violates the AOC's policies and federal and state law. The materials define sexual harassment, detail employees' rights, and outline a procedure for formal and informal complaints. *See* Battle Cert. Exs. A, B. The complaint procedure set forth in the materials specifically explains that victims who are harassed by an immediate supervisor should bypass that individual and file a written complaint with the Administrative Director of the Courts. *See id.;* AOC 56.1 Statement ¶ 9.

On or about January 12, 1995, the state judiciary issued a new anti-harassment policy. *See* Battle Cert. Ex. C. This policy again made clear that sexual harassment would not be tolerated, and set forth the formal and informal complaint procedure. As with the prior anti-harassment materials, the 1995 policy provided that victims should bypass their immediate supervisor if he or she were the alleged harasser. *See* Battle Cert. Ex. D.

The anti-harassment materials were posted and distributed to all judiciary employees. *See* Battle Cert. ¶ 2, 6; Battle Dep. at 30 (attached to AOC Reply Br.). Newsome received a copy of the sexual harassment materials when she arrived at the JISP in 1993. *See* Griffin Cert. Ex. F, Newsome Dep. at 26. In addition, Battle conducted ongoing training for all employees, including supervisory personnel such as Hill and Coleman. *See* Battle Cert. ¶ 7.

In October 1995, defendant Battle conducted a sexual harassment training for the JISP Northern Region staff. *See* Newsome Ex. S, Newsome Dep. at 14.[7] At a staff meeting on November 8, 1995, Gina Evans, another JISP staff member, who has also alleged that she was harassed by Coleman, announced that Coleman treated one staff member more leniently because "she had something over [his] head." Coleman Aff. ¶ 61; Ex. N to Coleman Br. in Support of Summ.J. (New-

---

7. It appears that this training was a special *session* held *following* an incident involving Gina Evans, another JISP employee, and plaintiff in Civil Action No. 97–3214(JAG). At some point in 1995, a JISP volunteer-mentor who worked with one of the program's juveniles tried forcibly to kiss Evans. Evans complained to Coleman. Although the volunteer-mentor was fired promptly, Evans alleges that Coleman responded inappropriately. She alleges that he was dismissive, laughed at her, and stated "I can't help it if you are so voluptuous, maybe he was trying to get his tongue in between your gap," or words to that effect. *See* Newsome Ex. I (Evans memo dated July 31, 1995). Evans, displeased with this response, wrote a memo to Coleman, dated June 13, 1995, on which Hill was copied, requesting further training. *See* Newsome

Ex. B. Newsome contends that this memo put Hill and the AOC on notice of Coleman's behavior. From the record evidence, however, there is no suggestion that any of this information was provided to Hill and other AOC supervisors at this time. The June memo does not relay Coleman's alleged inappropriate *comment,* it merely references the mentor incident and requests "training" for the entire office. *See id.* It is only clear that Hill knew that Evans felt that Coleman had not taken the incident sufficiently seriously. *See* Newsome. Ex. A, Hill Dep. at 51. The Court also notes that the remark attributed to Coleman in Evans' July 31, 1995 memo (Newsome Ex. I) is only discussed here for purposes of background and to provide a context for this special training session.

some's "Chronological Order of Incidents") (hereinafter "Newsome Chrono"). At a staff meeting the following week, on November 15, 1995, Coleman announced that he had heard that Newsome believed he was harassing her. *See* Griffin Cert. Ex. E, Newsome Dep. at 25. Following the November 15 meeting, Newsome contacted defendant Hill, who had left the meeting prior to Coleman's comment, and told him that she wanted to file a formal harassment complaint. *See* Griffin Cert. Ex. E, Newsome Dep. at 37, Ex. F, Newsome Dep. at 19.

The following day, November 16, 1995, Newsome spoke with Hill again and requested a transfer to a new supervisor. That day, Kevin Brown became Newsome's supervisor. *See* Griffin Cert. Ex. E, Newsome Dep. at 39–40. Every other aspect of Newsome's job remained unchanged.

On November 28, 1995, Newsome met with Hill again, who informed her that he had by that time told Coleman that she would be filing a formal complaint. *See* Newsome Chrono.[8] Hill put Newsome in touch with defendant Battle, with whom Newsome filed an official complaint alleging "ongoing sexual harassment since being employed with the JISP." *See* Newsome Chrono; Griffin Cert. Ex. F, Newsome Dep. at 21–22; Newsome Ex. NN. She requested that she be assigned to a new supervisor, that the harassment cease, and that she be

treated with "respect and dignity." Newsome Ex. NN.[9]

In May 1996, the EEO/AA released the report of its investigation into Newsome's harassment complaint. Over the course of the investigation, defendant Battle interviewed Newsome, Coleman, and eight other JISP employees concerning Newsome's allegations. The report concluded that Newsome's claims were "unsubstantiated." Newsome Ex. PP.

On March 15, 1996, Newsome filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"), which alleged that Coleman subjected her to sexual harassment from the time she was hired. She alleged that Coleman tried to kiss her on numerous occasions, the last of which was in 1994. She further alleged that Coleman manipulated his position as her supervisor to get her to go places with him, and that he constantly touched, hugged, and kissed her, and made comments of a sexual nature. *See* Battle Cert. Ex. K. The EEOC issued Newsome a right-to-sue letter on October 31, 1996. *See* Newsome Ex. BBB.

### DISCUSSION

I. *Standard for Summary Judgment*

Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celo-*

---

**8.** At oral argument, Newsome's counsel argued that Hill had told Coleman about Newsome's complaint earlier, and that Coleman's remark at the November 15 meeting constituted harassment or retaliation against Newsome. No evidence in the record supports this assertion. The only facts in the record on this point—including the chronology prepared by Newsome herself—indicate that Newsome informed Hill that she wanted to file a complaint after the November 15 meeting, and that Hill relayed the information to Coleman several days later at the annual state judicial staff college meeting. *See* Newsome Chrono; *see also* Newsome Ex. LL, Goldstein Dep. at 51–52 (describing conversation among William Goldstein, Hill, and Coleman at judicial staff college meeting in which Coleman was informed that Newsome intended to file a complaint). This Court takes judicial notice of the fact that the 1995 judicial staff college meeting took place on November 19, 20, and 21 of that year, several days *after* the November staff meeting. *See* Tr. of Oral Arg. at 125–30; *see also* Fed.R.Evid. 201.

**9.** Several months later, Newsome took a leave of absence and underwent therapy to deal with the stress she faced as a result of this lawsuit and the alleged harassment. *See* Newsome Ex. XX, Newsome Dep. at 50–51.

*tex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the Court must draw all reasonable inferences in favor of the nonmovant. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994); *National State Bank v. Federal Reserve Bank of N.Y.,* 979 F.2d 1579, 1581 (3d Cir.1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed.R.Civ.P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3d Cir.1992) (quoting *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548).

In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences—including on issues of credibility—in favor of the nonmoving party. *See Watts v. University of Delaware,* 622 F.2d 47, 50 (3d Cir.1980).

## II. *LAD Claims and the Pretrial Order*

As a preliminary matter, this Court must determine the fate of Newsome's LAD claims, which were not designated in the pretrial order among "Plaintiff's Legal Issues" to be contested at trial. Defendants contend that the omission constitutes a waiver of all LAD claims. Newsome concedes the claims' omission, and urges the Court to excuse the oversight and permit her to pursue them.

"The order following a final pretrial conference shall be modified only to prevent manifest injustice." Fed.R.Civ.P. 16(e); *see also Petree v. Victor Fluid Power, Inc.,* 831 F.2d 1191, 1194 (3d Cir.1987). Absent a showing of manifest injustice, the decision to allow a party to amend a final pretrial order is within this Court's sound discretion. *See Pharmaceutical Sales & Consulting Corp. v. J.W.S. Delavau Co.,* 59 F.Supp.2d 408, 411–12 (D.N.J.1999).

It would be manifestly unjust to compel Newsome to proceed without the LAD claims. The exclusion of the LAD claims would, in large part, vitiate Newsome's case because the standards for employer liability under the LAD are broader, *see generally Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445 (1993), and the LAD alone permits her to pursue claims against the individual defendants. *Compare Dici v. Com. of Pennsylvania,* 91 F.3d 542, 552 (3d Cir.1996) (no individual liability under Title VII) *with Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 126 (3d Cir.1999) (LAD permits individual supervisory employee liability under aiding and abetting theory). Moreover, defendants concede that they will suffer no prejudice from amending the pretrial order to include the claims as violations of the LAD were pled in the complaint, and extensive discovery took place under the presump-

tion that the LAD claims remained active. In light of the unfairness to Newsome and the lack of prejudice to defendants, Newsome may supplement the pretrial order to incorporate her claims under the LAD. *See Pharmaceutical Sales,* 59 F.Supp.2d at 412 (considering lack of prejudice or surprise to non-moving party in permitting modification to pretrial order to amend counterclaim).[10]

### III. *Hostile Work Environment*

Newsome has brought claims under Title VII and the LAD in connection with Coleman's alleged harassment. As the complainant, Newsome bears the burden of establishing a prima facie case of sexual harassment. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Reyes v. McDonald Pontiac GMC Truck, Inc.,* 997 F.Supp. 614, 617–18 (D.N.J.1998) (discussing Title VII and the LAD).

### A. *Title VII*

Title VII forbids an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "It is well established that a plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment." *Kunin v. Sears Roebuck & Co.,* 175 F.3d 289, 293 (3d Cir.1999) (citing *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

■■■ The Court of Appeals for the Third Circuit has enunciated five factors that must be shown to establish the existence of an actionable hostile work environment: "(1) the employee suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Kunin,* 175 F.3d at 293 (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990)). Defendants are entitled to summary judgment if they show that no genuine issues of material fact exist as to a plaintiff's failure to establish any of these five factors.[11]

■■■ In considering whether a hostile environment exists, this Court should consider the totality of circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance.' " *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Title VII provides no redress, however, for the "innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex . . . it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

---

10. The pretrial order also failed to enumerate certain plaintiff's exhibits that were included in Newsome's summary judgment opposition. In accordance with the schedule set forth by the Court at oral argument, Newsome may propose the additional exhibits to defendants and amend the pretrial order to include those items. Magistrate Judge Haneke shall rule on any defense objections.

11. It is beyond dispute in this Circuit that individual employees cannot be held liable under Title VII. *See Dici v. Pennsylvania,* 91 F.3d 542, 552 (3d Cir.1996). Accordingly, summary judgment is granted with respect to Newsome's Title VII claims against defendants Coleman, Battle, and Hill.

## B. The LAD

The LAD was enacted to eradicate the "cancer of discrimination." *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 600, 626 A.2d 445 (1993) (citations omitted). As with Title VII, sexual harassment is a form of discrimination prohibited by the LAD. *See id.* at 601, 626 A.2d 445. Although the New Jersey Supreme Court frequently looks to Title VII jurisprudence in interpreting the LAD, *see id.* at 600–01, 626 A.2d 445, it has adopted a slightly broader test than that of the Third Circuit for hostile environment harassment. To state a hostile environment claim under the LAD, Newsome must show that: "the complained-of conduct (1) would not have occurred but for [her] gender; and it was (2) severe or pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Id.* at 603–04, 626 A.2d 445.[12]

## C. Prima Facie Case

Newsome has set forth substantial evidence of repeated unwelcome sexual advances by Coleman. To counter that showing, Coleman points to several inconsistencies and vagaries in Newsome's deposition testimony. This evidence, however, simply goes to the credibility of Newsome's version of the events, and the weight a juror might accord it. On this motion for summary judgment, all reasonable inferences, including those on credibility, must be drawn in Newsome's favor. *See Watts v. University of Delaware*, 622 F.2d 47, 50 (3d Cir.1980). Drawing those inferences, this Court concludes that a reasonable juror could find that Coleman's actions were sufficiently "regular and pervasive" or "severe or pervasive" to create a hostile or abusive work environment. Newsome has thus made a prima facie case of sexual harassment under both Title VII and the LAD.[13]

## IV. Employer Liability Under Title VII

Newsome seeks to impose liability on the AOC, as her employer, for Coleman's alleged harassment. Under Title VII, employers may be held vicariously

---

12. The *Lehmann* court expressly rejected the more extreme "regular and pervasive" test set forth by the Third Circuit in *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990), in favor of a disjunctive "severe or pervasive" requirement. *See Lehmann*, 132 N.J. at 606–07, 626 A.2d 445. The *Lehmann* court reasoned that a "regular and pervasive" requirement was inconsistent with developments in Supreme Court Title VII jurisprudence, and would improperly "bar actions based on a single, extremely severe incident or, perhaps, even those based on multiple but randomly occurring incidents of harassment." *Id.* at 606, 626 A.2d 445. Although one court in this District has stated that the *Andrews* "pervasive and regular" test is no longer the governing standard for Title VII cases in this Circuit, *see Domm v. Jersey Printing Co.*, 871 F.Supp. 732, 739 n. 4 (D.N.J.1994), the Third Circuit has recently cited *Andrews* with approval in *Kunin*, cited in Part III(A), *supra*, and *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir.1997).

13. Newsome also alleges that she faced quid pro quo harassment. The record is utterly devoid of evidence to support this claim. Beyond a statement by Newsome's counsel at oral argument that Coleman was "cold" to her when she rebuffed him, Newsome has put forth nothing to suggest that any job benefits or conditions were contingent—explicitly or implicitly—on her acceding to Coleman's advances. *See generally Bonenberger v. Plymouth Township*, 132 F.3d 20, 27 (3d Cir.1997) (describing elements of quid pro quo harassment under Title VII); *Lehmann*, 132 N.J. at 601, 626 A.2d 445 (articulating a nearly identical standard under the LAD); *see also Hurley*, 174 F.3d at 120, 121 n. 19 (noting that the Supreme Court, in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) "largely eliminated the distinction between hostile work environment claims and quid pro quo claims, focusing instead on the presence or absence of tangible adverse employment actions," and opining that New Jersey might still retain quid pro quo cause of action under the LAD). Accordingly, defendants' motions for summary judgment are granted on any and all claims premised on a quid pro quo theory of liability.

**818**

liable for a hostile environment created by a supervisor. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Extending traditional agency principles to the Title VII context, the Supreme Court has held that an employer is liable for harassment committed by a supervisory employee within the scope of his or her employment—"where the employee's purpose, however misguided, is wholly or in part to further the master's business." *Ellerth,* 524 U.S. at 756, 118 S.Ct. 2257 (citation omitted). The Court has also made clear that the employer is properly subject to Title VII liability when the supervisory employee's harassment "is made possible or facilitated by the existence of the actual agency relationship." *Faragher,* 524 U.S. at 802, 118 S.Ct. 2275; *see also Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 150 (3d Cir.1999) (discussing *Ellerth/Faragher* test for liability under "aided by the agency relation" theory).

Here, there is no suggestion that Coleman sexually harassed Newsome to further the interests of the AOC. Nevertheless, because Coleman's ability to harass Newsome was made possible by his role as a supervisory employee, the liability of the AOC is properly analyzed under the "aided by the agency relation" rubric set forth by the Supreme Court in *Ellerth* and *Faragher.*

▇▇▇ Under this analysis, when the plaintiff-employee has faced no tangible employment action as a result of her rejection of her harasser's advances or complaints about his harassment, the employer is permitted to raise an affirmative defense to liability or damages. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Under this defense, an employer is absolved of liability if it can show, by a preponderance of the evidence, (a) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

▇▇▇ The employer is not entitled to an affirmative defense, however, when "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.; see also id.* at 761, 118 S.Ct. 2257 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). In such a case, the employer is automatically liable upon determination that harassment indeed occurred. Any evidence that the employer had implemented anti-harassment policies is irrelevant to the inquiry once the plaintiff-employee has suffered a tangible adverse employment action. *See Durham,* 166 F.3d at 149.

### A. Tangible Employment Action

▇▇▇ The AOC contends that it is entitled to present an affirmative defense—and that there are no genuine issues as to any material fact with respect to that defense—because Newsome suffered no tangible adverse employment action. More specifically, the AOC maintains that it is entitled to summary judgment regardless of whether a jury could ultimately find that Coleman harassed Newsome.

To this day, Newsome remains employed as a Community Development Specialist with the AOC. *See* Tr. of Oral Arg. at 76. Upon informing her superiors that she wanted to file a harassment complaint and to request a new supervisor, she was removed from Coleman's supervision and assigned to Kevin Brown. She was neither demoted nor transferred, no job duties were taken away from her, and there is no contention that she was denied a desired or deserved promotion. Newsome's argument to this Court that she suffered a tangible adverse employment

action from a general perception that she and Coleman were having an affair because "Coleman gave Ms. Newsome preferential treatment" is untenable. Tr. of Oral Arg. at 48.[14] As it is abundantly clear from the record that Newsome suffered no adverse employment action, the AOC may present the *Ellerth/Faragher* affirmative defense. *Cf. Durham*, 166 F.3d at 153–54 (loss of office, dismissal of secretary, removal of critical files, and reassignment to less lucrative clients, resulting in a 50% pay decrease, constituted tangible adverse employment action and precluded affirmative defense).

## B. Affirmative Defense to Vicarious Liability

### 1. Reasonableness of the AOC

The first inquiry in the affirmative defense considers whether the AOC took reasonable care to prevent and to correct promptly any sexually harassing behavior. The AOC had in place a comprehensive anti-harassment policy that was distributed to all employees. Newsome admits that she received this information upon her arrival in 1993. When revised policies were promulgated in January 1995, those too were distributed to the employees. These materials made clear that sexual harassment was prohibited, and set forth clear informal and formal procedures for lodging complaints. The policy further provided a means to bypass an immediate supervisor if that individual was the harasser. Sexual harassment awareness training sessions were held regularly. Moreover, when Gina Evans voiced concerns over the inappropriate actions of a volunteer-mentor, a special training session was held.

The only evidence in the record indicates that Newsome first brought her alleged harassment by Coleman to the AOC's attention on November 15, 1995, following the staff meeting.[15] Newsome was removed from Coleman's supervision nearly immediately—as she had requested. Newsome does not allege any incidents of harassment following her complaint. Within several business days, Newsome filed a formal internal complaint, which triggered an internal investigation. The investigation took many months to complete, and ultimately found Newsome's allegations to be unsubstantiated.

The Supreme Court in *Ellerth* noted in this regard:

> While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appro-

---

**14.** Newsome claimed at oral argument that Coleman placed negative performance evaluation memos in her personnel file when she rejected his advances. After scouring the record, this Court has found only one performance evaluation of Newsome, which covered 1997–98, long after her Coleman ceased to be her supervisor, and, indeed, well after Coleman was terminated by the AOC in 1996. *See* Newsome Ex. ZZ. In any event, it is undisputed that Newsome suffered no adverse consequence as a result of these alleged negative memoranda.

**15.** Newsome urges the Court to find that the AOC was on notice of Coleman's harassing behavior in June of that year, when Gina Evans provided Hill with a copy of her memo to Coleman. *See* discussion note 7, *supra*. The only harassment evident from Evans' memo was that by the volunteer-mentor, who was terminated promptly. The memo contains no suggestion that Coleman harassed Newsome—or anyone else for that matter. It simply requests further training to avoid further incidents, which training was provided. Newsome suggests, based on a transcription error and a misreading of Hill's deposition transcript, that Hill and others recognized the scope of Evans' complaint and intended to ignore her concerns. *See* Newsome 56.1 Statement ¶¶ 8, 9; Newsome Ex. A; Newsome Br. in Opp. to Summ.J. at 19 (quoting Newsome Ex. A, Newsome Dep. at 53 [incorrectly cross-referenced as Ex. S]). From Hill's testimony and the plethora of other evidence before this Court, however, it is clear that Hill felt that despite the yearly anti-harassment trainings, a special session should be held in order *not* to ignore Evans' concerns.

priately be addressed in any case when litigating the first element of the defense.

524 U.S. at 765, 118 S.Ct. 2257; *see also Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir.1999) (noting that "[w]hile not required as a matter of law, the existence of an appropriate anti-harassment policy will often satisfy this first prong") (citations omitted). This Court finds, as a matter of law, that by implementing and disseminating a comprehensive anti-harassment policy with specific complaint procedures and, significantly, a mechanism for the bypass of an immediate supervisor, by conducting training sessions, and by acting immediately upon learning of Newsome's concerns to prevent any further harassment by Coleman, the AOC acted reasonably and satisfied the first element of the affirmative defense.

#### 2. *Newsome's Reasonableness*

■ This Court must also assess the reasonableness of Newsome's actions in determining whether the AOC is absolved of Title VII liability. Newsome alleges that harassment commenced nearly immediately upon her arrival in October 1993. Although her recollection of dates is somewhat hazy, no incidents are alleged in 1995. It was not, however, until November 15, 1995 that Newsome informed Hill that she wanted to file a complaint, which she filed on November 28, 1995. Although the AOC may prove that Newsome acted unreasonably other than by demonstrating an "unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

It is undisputed that Newsome had a copy of the anti-harassment policy and complaint procedure from the time she arrived at the AOC in the fall of 1993. It is further undisputed that the policy clearly sets forth a mechanism for Newsome to lodge a complaint and to bypass Coleman in the process. That notwithstanding, Newsome waited until the end of 1995 to bring her issues with Coleman to the attention of anyone of authority. Her failure to lodge a complaint earlier—either formally or informally—was eminently unreasonable. *See, e.g., Montero v. Agco Corp.*, 192 F.3d 856, 863–64 (9th Cir.1999) (affirming summary judgment in employer's favor where employee waited two years before taking advantage of company's corrective procedures, of which she had knowledge); *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999) (affirming summary judgment in employer's favor where employee failed to utilize internal complaint mechanism, despite employee's concerns about co-workers' reactions); *Shaw*, 180 F.3d at 812–13 (employee's failure to notify anyone of alleged harassment prior to quitting unreasonable as a matter of law).

Title VII aims to encourage employers to prevent workplace harassment. The AOC should not be held liable for two alleged years' harassment by Coleman when Newsome sat silent and failed to utilize the extensive complaint procedures that the AOC had established. Accordingly, the AOC has satisfied the *Ellerth/Faragher* affirmative defense and its motion for summary judgment on Newsome's Title VII claim is granted.

### V. *Pendent State Claims*

■ Although this Court has granted summary judgment on all of Newsome's federal claims, it will retain jurisdiction over the pendent state claims. In *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir.1976), the Third Circuit recognized that pendent jurisdiction is "essentially a discretionary doctrine," but noted that when federal claims are disposed of by a dismissal, pursuant to Fed.R.Civ.P. 12(b)(6), or on summary judgment, pursuant to Fed.R.Civ.P. 56, a district "court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary

circumstances." *Id.* at 195–96. After finding that the *Tully* plaintiffs lacked standing to pursue their federal securities law claims, the Third Circuit directed that the pendent state claims be dismissed, emphasizing that "the hallmark considerations of 'judicial economy, convenience, and fairness to litigants' [did not] dictate that the pendent claims be entertained." *Id.* at 196. The Court further noted in this regard that the *Tully* plaintiffs' rights were not prejudiced by dismissal of pendent state claims since the dismissed claims substantially overlapped with claims raised in a pending state court proceeding. *See id.* at 196–97; *see also Weaver v. Marine Bank*, 683 F.2d 744, 746–48 (3d Cir.1982) (dismissal proper where Pennsylvania statute permitted transfer of state claims to state court).

Here, by contrast, there is no pending state proceeding and Newsome may no longer pursue her claims in state court. LAD claims in which the operative facts occurred after July 27, 1993, as is the case here, are governed by a two-year statute of limitations. *See Montells v. Haynes*, 133 N.J. 282, 286, 298, 627 A.2d 654 (1993). Newsome's state tort law claim is also governed by the two-year statute of limitations, and thus would be time-barred as well. *See* N.J.S.A. § 2A:14–2 (two-year statute of limitations for all personal injury actions). Moreover, Newsome established a prima facie case of sexual harassment on her federal claim—summary judgment was granted on the basis of an affirmative defense that did not exist until well after she instituted this federal action. *Cf. Tully*, 540 F.2d at 196 ("Since there was no substantial federal claim to which the state claims could be appended, the primary justification for the exercise of jurisdiction was absent."). Newsome's case thus presents extraordinary circumstances that warrant the continued exercise of jurisdiction,

and this Court shall consider the merits of her state law claims.

### A. Liability Under the LAD

#### 1. Employer Liability

 As with Title VII, under the LAD, traditional agency principles govern the extent to which the AOC may be liable for compensatory damages for Coleman's actions. *See Lehmann*, 132 N.J. at 619, 626 A.2d 445.[16] When a supervisor such as Coleman, acting within the scope of his employment, harasses an employee under his supervision, the employer is vicariously liable. *See id.* at 624, 626 A.2d 445. When a supervisory employee acts outside of the scope of his employment, "the employer will be vicariously liable if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship." *Id.*

Negligence is thus one theory under which an employer may be held vicariously liable. A "plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms." *Lehmann*, 132 N.J. at 621, 626 A.2d 445. In moving for summary judgment, the AOC has focused narrowly on this route to employer liability, contending that it should be exonerated under the LAD because it implemented anti-harassment procedures. On this front, the *Lehmann* court expressly avoided adopting a bright-line rule that "the absence of such mechanisms automatically constitutes negligence, [ ]or that the presence of such mechanisms demonstrates the absence of negligence." *Id.* It did note, however, that "the existence of effective preventative mechanisms pro-

---

16. As explained in Part II, *supra*, Newsome omitted her LAD causes of action from the final pretrial order. Thus, the theories underlying her LAD claims are somewhat unclear.

This Court's analysis reflects a broad reading of Newsome's submissions and the arguments contained therein.

vides some evidence of due care on the part of the employer." *Id.*

■ "Effective preventative mechanisms" contain five elements: (1) policies, (2) formal and informal complaint structures, (3) mandatory training for supervisors and managers, as well as training offered to all employees; (4) some effective "sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted"; and (5) an unequivocal commitment from top management that the policy "is not just in words but backed up by consistent practice." *Lehmann,* 132 N.J. at 621, 626 A.2d 445 (citation omitted). It is clear then, that the mere implementation and dissemination of anti-harassment procedures with a complaint procedure does not alone constitute evidence of due care—let alone resolve all genuine issues of material fact with regard to due care.

■ Moreover, the AOC has introduced no evidence under the fourth prong to demonstrate that it monitored its policies to ensure that they were trusted by AOC employees. Indeed, even if the AOC had introduced evidence on all five elements such that no genuine issues of material fact existed as to whether the AOC had promulgated "effective preventative mechanisms" (as defined by *Lehmann* ), it is clear that their presence alone does not, as a matter of law, prevent the imposition of employer liability under a negligence theory. *See id.* at 621, 626 A.2d 445.[17] The question of whether the AOC "negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims" is one for the jury.

*Lehmann,* of course, made clear that negligence is not the only path to employer liability. Newsome's allegations in this case suggest that the AOC may also be held liable because Coleman's supervisory role allowed him to harass Newsome. Under the LAD, "an employer can be held liable for compensatory damages stemming from a supervisor's creation of a hostile work environment if the employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment." *Lehmann,* 132 N.J. at 624, 626 A.2d 445. More specifically, the New Jersey Supreme Court has noted that "[a]n employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor 'to control the day-to-day working environment' facilitates the harassing conduct." *Cavuoti v. New Jersey Transit Corp.,* 161 N.J. 107, 117, 735 A.2d 548 (1999). The reasonableness of the AOC's actions in implementing anti-harassment policies is no defense to harassment committed because of the agency relationship.

■ This Court has already determined that Newsome stated a prima facie hostile environment claim under the LAD, and that whether a hostile environment did indeed exist is a question of fact for the jury. If the jury finds that Coleman's actions were sufficiently severe or pervasive to create a hostile work environment, it must then consider whether Coleman was able to commit those acts because of the authority delegated him by the AOC. If the jury answers in the affirmative, the AOC will be vicariously liable, irrespective of its anti-harassment policies. Accordingly, the AOC's motion for summary judgment on Newsome's LAD claim is denied.[18]

---

**17.** *Lehmann* noted that the absence of effective preventative mechanisms constitutes compelling evidence of an employer's negligence. *See Lehmann,* 132 N.J. at 622, 626 A.2d 445.

**18.** As with her substantive LAD claims, Newsome's request for punitive damages against

the AOC under the LAD was omitted from the pretrial order. Punitive damages may be awarded against an employer upon proof that upper management actually participated in, or was willfully indifferent to, the offending wrongful conduct, and that the conduct was "especially egregious." *Rendine v. Pantzer,* 141 N.J. 292, 313–14, 661 A.2d 1202 (1995).

## 2. *Individual Defendants*

Newsome argues that defendants Coleman, Hill, and Battle have violated the LAD and should be held individually liable. Although the New Jersey Supreme Court has never addressed the issue, the Third Circuit has predicted that New Jersey would follow Title VII on the subject and refuse to impose liability on individuals as "employers" under the statute. *See Hurley,* 174 F.3d at 125. Individual supervisory employees may be held personally accountable, however, if they "aid, abet, incite, compel or coerce" the harassment of another, in violation of the LAD. N.J.S.A. § 10:5–12(e); *see also Hurley,* 174 F.3d at 126; *Failla v. City of Passaic,* 146 F.3d 149, 155–58 (3d Cir.1998) (predicting that New Jersey Supreme Court would follow Restatement (Second) of Torts for determining aiding and abetting liability under the LAD).

As an initial matter, defendant Coleman is entitled to summary judgment on the LAD claims against him. As noted above, there is no direct individual liability under the statute. Moreover, Coleman, as the alleged principal wrongdoer, cannot aid and abet his own wrongful conduct. *Hurley,* 174 F.3d at 126 (noting that aiding and abetting liability may lie for "harm resulting to a third person from the conduct of *another*") (quoting *Failla,* 146 F.3d at 158) (emphasis added).[19]

Newsome advances aiding and abetting claims against Hill and Battle. She alleges that they knew of Coleman's harassing conduct and failed to act to prevent it. Hill or Battle may be held liable for harm to Newsome "from the conduct of another when he 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'" *Failla,* 146 F.3d at 158 (quoting Restatement (Second) of Torts § 876(b)). The failure to act will give rise to liability when it rises to the level of substantial assistance or encouragement. *See Failla,* 146 F.3d at 158 n. 11; *Hurley,* 174 F.3d at 126.

The Third Circuit has delineated six factors to be considered in analyzing whether a defendant provided "substantial assistance." Substantial assistance will depend on the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the harasser, his state of mind, and the duration of the assistance provided. *See Hurley,* 174 F.3d at 127 n. 27 (citing Restatement (Second) of Torts § 876(b) cmt. d and *Halberstam v. Welch,* 705 F.2d 472, 484 (D.C.Cir.1983)).

Hill contends that the allegations against him—that he failed to discipline Coleman, failed to take sufficient corrective measures, and failed to prevent a hostile environment—fail as a matter of law.

It appears from Newsome's request for punitive damages under Title VII (now moot following this Court's grant of summary judgment in favor of all defendants on the Title VII claims) that the punitive damages request concerns defendant Battle's alleged failure to investigate Newsome's claim properly. *See* Pretrial Order at 7. If Newsome's punitive damages claim is a contention that upper management maliciously failed to investigate her complaint, the record with respect to the actions of Hill and Battle reveals that no genuine issues of material fact exist to suggest any wrongful conduct on the part of upper management either before or after Newsome filed a complaint. Defendants' motion for summary judgment is therefore granted. In Newsome's brief in opposition to summary judgment, however, the only mention of punitive damages is with regard to Coleman himself. As with the first theory, if Newsome contends that the AOC is subject to punitive damages for Coleman's alleged harassment, summary judgment is proper because no evidence of record supports a finding that anyone in upper management either actually participated or was willfully indifferent to any wrongful conduct on the part of Coleman.

**19.** Even Newsome does not attempt to twist her claims to allege that Coleman aided and abetted the wrongdoing of the AOC in its failure to discipline Coleman, which would simply be a transparent effort to evade the prohibition of direct individual liability.

There is neither any allegation that Hill provided Coleman with substantial assistance nor any evidence to support such a finding. The record reveals that Hill learned of Newsome's difficulties with Coleman on November 15, 1995. The next day, as Newsome requested, Hill assigned her to a new supervisor and steered her toward the appropriate channels for commencing the complaint process.[20] There are no allegations of incidents of harassment following her conversation with Hill. Indeed, even if Gina Evans' June memo to Coleman requesting training could be said to provide Hill with notice that Coleman was harassing Newsome—which it cannot—there are no incidents of harassment alleged subsequent to that purported earlier notice. In other words, at no time did Hill fail to prevent harassment of which he was or should have been aware.[21]

 The Court notes in this regard that the failure to prevent harassment does not rise to the level of substantial assistance or encouragement of it. There is not a shred of evidence to indicate that Hill was present when Coleman acted inappropriately toward Newsome or any other woman, that he had a culpable state of mind, or that he and Coleman were good friends. Moreover, after becoming aware that Evans felt that Coleman did not take the mentor incident seriously enough, Hill told Coleman to be careful about his response to such incidents because "it could get him in trouble." That remark suggests discouragement, not assistance.[22] As no reasonable juror could possibly conclude that Hill aided and abetted Coleman's harassment of Newsome, Hill's request for summary judgment on this claim is granted.

The record is similarly barren with respect to Battle. Battle's role was to investigate Newsome's claims after she lodged a complaint. Not an iota of testimony or other evidence suggests that he had any knowledge of Coleman's actions prior to November 1995, when Hill put Newsome in touch with Battle. Indeed, other than conducting harassment training sessions that Coleman attended, nothing indicates that Battle had any contact with Coleman at all. Newsome contends that Battle's investigation was a cover-up because certain witnesses testified differently at their depositions than in their interviews with the AOC investigator.[23] This empty, in-

---

**20.** Newsome argues that Hill told Coleman about her intention to file a complaint, in violation of the AOC's harassment policy. The AOC anti-harassment manual makes clear that complainants may request anonymity. *See* Newsome Ex. KK at 4. There is nothing in the record, however, to suggest that Newsome made such a request. Moreover, irrespective of any request for confidentiality, it is clear that Hill's conversation with Coleman did not assist—substantially or otherwise—any harassment of Newsome. The undisputed evidence shows that the conversation between Hill and Coleman occurred *after* Coleman made Newsome uncomfortable at a staff meeting by announcing that he knew she felt he had harassed her (which is the last time Newsome complained of any harassment by Coleman). *See* note 8, *supra.*

**21.** As discussed at note 15, *supra,* Newsome's suggestion that Hill intended to ignore Evans' concern that more sexual harassment training was needed is based on an untenable reading of a narrow snippet of Hill's deposition testimony and will not be credited.

**22.** This quote, which appears at page 56 of Hill's deposition, was referenced in Newsome's 56.1 Statement but omitted from the Court's copy of the cross-referenced Exhibit A. The Court has found that page among the exhibits submitted in a motion in a related case and will assume that its omission in this matter was inadvertent.

**23.** In the pretrial order, Newsome charges Battle more specifically with failing "to conduct a timely, fair, objective, and responsible investigation" into Newsome's complaint, thereby acting in concert with other defendants to discriminate against Newsome. *See* Pretrial Order at 6–7 ¶ 1(a). As with her more general allegations, there is nothing in the record to suggest that Battle acted to stall or hinder the investigation. Moreover, the record is clear that as soon as Newsome lodged an official complaint, the AOC obliged her request for a transfer to a new supervisor and all alleged harassment ceased.

flammatory allegation for which Newsome fails to provide substantive support cannot create a genuine issue as to material fact. Accordingly, Battle's motion for summary judgment on Newsome's LAD claims against him individually is granted.

### B. *Intentional Infliction of Emotional Distress*

■ In addition to alleging violations of Title VII and the LAD, Newsome charges Coleman with the intentional infliction of emotional distress. To state a claim under New Jersey law for intentional infliction of emotional distress, Newsome must demonstrate that Coleman acted intentionally or recklessly to cause Newsome distress and that his conduct was "extreme and outrageous," that is, "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley v. Trenton Saving Fund Soc'y*, 111 N.J. 355, 366, 544 A.2d 857 (1988) (quoting comments to Restatement (Second) of Torts § 46). Newsome must also prove that Coleman's intentional, extreme, and outrageous conduct was the proximate cause of her distress and that her distress was "so severe that no reasonable person could be expected to endure it." *Id.* at 366–67, 544 A.2d 857.

■ As an initial matter, sexual harassment alone generally does not rise to the level of outrageousness required for intentional infliction of emotional distress. *See Ferraro v. Bell Atlantic Co.*, 2 F.Supp.2d 577, 589 (D.N.J.1998) (citation

omitted). Unquestionably, situations do arise where sexual harassment is sufficiently severe to constitute intentional infliction of emotional distress. *Cf., e.g., Taylor v. Metzger*, 152 N.J. 490, 507–08, 519–20, 706 A.2d 685 (1998) (single racial slur sufficiently severe to survive summary judgment on hostile environment and intentional infliction of emotional distress). Here, Newsome has introduced evidence of repeated unwelcome contact by Coleman, including incidents that occurred after Newsome had asked him to stop. She has also offered evidence that she took a medical leave of absence and underwent therapy following Coleman's alleged harassment. Although Newsome must clear several high hurdles in proving the elements of this cause of action, this Court cannot say at this stage, as a matter of law, that she will not be able to meet that challenge. Accordingly, Coleman's motion for summary judgment on Newsome's claim of intentional infliction of emotional distress is denied.[24]

### VI. *Sanctions*

Finally, Newsome and Coleman have cross-moved for sanctions, although they do not indicate the Rule pursuant to which they have made their requests. Newsome maintains that Coleman should receive sanctions for filing a false affidavit. Meanwhile, Coleman's counsel asserts that sanctions should be imposed on Newsome's counsel for implying that she improperly altered Newsome's portion of the pretrial order to exclude the LAD claims. This case has a voluminous record and has been

---

**24.** Coleman's request for summary judgment on Newsome's request for punitive damages with respect to this claim is likewise denied. *See Smith v. Whitaker*, 160 N.J. 221, 241, 734 A.2d 243 (1999) (explaining that punitive damages are warranted where the defendant's conduct constituted "intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and wilful disregard of the rights of another") (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 49, 477 A.2d 1224 (1984)); N.J.S.A. § 2A:15–5.12 (noting that punitive damages

may be awarded when plaintiff proves, by clear and convincing evidence, that she was harmed by defendant's acts or omissions and that "such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions"); *see also J.B. v. Bohonovsky*, 835 F.Supp. 796, 799 n. 4 (D.N.J.1993) (noting availability of punitive damages under New Jersey law in action for intentional infliction of emotional distress).

vigorously litigated since its inception, and this Court will not ascribe any malfeasance to any party. Both motions are denied.

### CONCLUSION

For all of the foregoing reasons, defendants' motions for summary judgment are granted in part and denied in part. The requests of Newsome and defendant Coleman for sanctions and attorney's fees are denied.