**Helen SWINGLE, Plaintiff,**

**v.**

**William J. HENDERSON, Postmaster General of the United States, and the United States Postal Service, Defendants.**

No. 99–1826(DRD).

United States District Court,
D. New Jersey.

May 8, 2001.

William F. Koy, William J. Koy, Law Firm of William Koy, L.L.P., Morristown, NJ, for Plaintiff.

Robert J. Cleary, United States Attorney, Robert A. Kirsch, Assistant United States Attorney, Newark, NJ, for Defendants.

### CORRECTED OPINION

DEBEVOISE, Senior District Judge.

This matter is before the court on the motion for summary judgment of defendant William J. Henderson ("Henderson"), Postmaster General of the United States. For the reasons that follow, the motion will be granted.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Helen Swingle ("Swingle") has been an employee of the United States Postal Service since September 7, 1991. Amended Complaint of Helen Swingle, filed 1/4/01, ¶ 10, at 3. She works as a rural postal carrier; her base of opera-

tions is a postal facility in Sparta, New Jersey. Swingle Compl. ¶¶ 10–11, at 3. In this action, she alleges that she has been subjected to gender-based discrimination and sexual harassment in her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), 42 U.S.C. § 2000e–3(a), and 42 U.S.C. § 2000e–16. More specifically, she claims she has been unlawfully subjected to disparate treatment based on her sex, Swingle Compl., ¶ 20–23, at 4–5; that she has been unlawfully subjected to a hostile work environment, *id.* ¶ 20, at 4; and that she has suffered unlawful retaliation for having reported the alleged discrimination and sexual harassment, *id.* ¶ 25, at 5; ¶ 28, at 5–6. She seeks judgment against her employer for her alleged "severe emotional and psychological distress, anguish, anxiety and injury, pain and suffering, and damage to her reputation and character," *id.* ¶ 28–33, at 6–7, and prays for relief in the form of compensatory damages, costs, and attorney's fees under 42 U.S.C. § 1981a(a)(1) and 42 U.S.C. § 2000e–16(d) (incorporating 42 U.S.C. § 2000e–5(k)), an injunction against further or future acts of discrimination or sexual harassment, and such other and further relief as might be appropriate. *Id.* ¶ 33(a)-(c), at 7.

Swingle's allegations stem from her interactions with Robert Krysiak ("Krysiak"), who was her principal supervisor from June 1993 until August 1998, at which time he was voluntarily transferred to another postal facility. Certification of Helen Swingle, Exhibit D to Declaration of William J. Koy, filed 3/26/01, ¶ 1, at 1; Transcript of Deposition of Helen M. Swingle, 11/9/00, at 138:18–20.[1] Swingle alleges Krysiak began sexually harassing

her late in 1995 or early in 1996. Swingle Certification ¶ 2(a), at 2; Swingle Depo. II, at 36:18–23, 37:14–16. Swingle's claims of gender-based discrimination and sexual harassment in the form of disparate treatment and creation of a hostile work environment are based upon the following allegations of Krysiak's conduct.

Swingle alleges that Krysiak would stand behind her while she worked and ask her inappropriate personal questions. Swingle Certification ¶ 2(a), at 2. She alleges that Krysiak began expressing heightened sexual interest in Swingle in the spring of 1996, when he allegedly began leering at her and staring at her buttocks. *Id.* ¶ 2(b). Krysiak would also allegedly ask Swingle what brand of blue jeans she was wearing and ask her to raise her shirt so he could see the label. *Ibid.* Krysiak allegedly told a male fellow worker that he had been watching "Helen's ass." *Ibid.* Swingle alleges that Krysiak would gyrate his hips and tell Swingle that he had her "beef." *Ibid.*

Swingle further alleges that Krysiak would stand behind her while she worked, whisper continuously to her, and make kissing sounds. *Id.* ¶ 2(c). He also allegedly called out her name and blew kisses to her, told her that he would be her "boy toy," and responded to Swingle's asking a clerk if certain mail was "DP" by asking Swingle if she had "peepee mail," whether she had a "pee pee," and whether she would let him touch her "pee pee." *Id.* at 2–3.

Swingle further alleges that in the summer of 1996, Krysiak sat in his car in front of her home blowing his car horn, and appeared unexpectedly on her route while she delivered mail. *Id.* ¶ 2(d), at 3.

---

1. Swingle's deposition was commenced on November 7, 2000, was continued on November 9, 2000, and was completed on November 21, 2000. These transcripts shall hereinafter be cited as "Swingle Depo. I," "Swingle Depo. II," and "Swingle Depo. III," respectively.

Swingle further alleges that in the fall of 1996, Krysiak pestered Swingle about her renting him a room in her home, and told fellow workers that he would be moving in with Swingle because he was losing his condominium and filing for bankruptcy protection. *Id.* ¶ 2(e).

Swingle further alleges that in October 1996, Krysiak began entering her work space, touching her arm and shoulder, and telling her in low tones how she was "so soft." *Id.* ¶ 2(f). He also allegedly "nuzzled" the back of her neck and asked her how she would "like it." *Ibid.* Krysiak would also allegedly spring on Swingle from behind, wrap his arms about her waist, and hug her, making unpleasant sounds. *Id.* at 3–4. Swingle alleges that she did everything possible to avert these attacks, including yelling at Krysiak when he came too close to her or leered at her and elbowing him in the midriff or stomping on his foot when he touched her. *Id.* ¶ 2(g), at 4. Krysiak allegedly told Swingle that he was unable to keep himself from touching her. *Ibid.* He also allegedly intimidated Swingle by asking her what she was going to do about his conduct. *Id.* ¶ 2(h).

Swingle further alleges that in October 1996, Krysiak entered her work space with a balloon in hand, made motions on the balloon with his hands, and asked her if she would want her breasts to be caressed in the same manner. *Id.* ¶ 2(i). He then allegedly became angry with Swingle. *Ibid.*

Swingle further alleges that at the end of 1996, Krysiak became extremely upset with Swingle when she refused his invitation to come to his home for a viewing of his extensive Christmas diorama. *Ibid.*

Both before and during the time in late 1995 or early 1996 that Krysiak's supposed harassment allegedly began, Swingle has admitted, she repeatedly engaged in sexually oriented, ribald, and provocative conduct while on the job.

During the Easter season in 1995 or 1996, Helen Swingle sat for an unusual family portrait with her daughters Nicole and Dawn. With Nicole's husband Steven behind the lens, Helen, Nicole, and Dawn posed for a semi-nude photograph featuring the three women naked below the waist. *See* Ex. 10, Kirsch Decl. The women all wore nothing but light-colored shirts bearing the phrase "No Johnny, You're Not Going To Get My Bud Light," and bent forward, facing away from the camera, with their exposed buttocks prominently thrust towards the viewer. Each woman bore one word written in large capital letters on her buttocks: Dawn, at left, bore the word "HAPPY"; Helen, in the center, bore the word "EASTER"; and Nicole, at right, bore the word "ROB." *Ibid.;* Swingle Depo. I, at 173:3–18. The resulting message, "HAPPY EASTER ROB," was apparently directed to a man named Robert who was Dawn's boyfriend at the time the photograph was taken. *Id.* at 173:19–20.

Swingle was taken enough with the photograph that she mentioned it to several of her fellow workers. *Id.* at 176:1–8. When she asked Dawn for the photograph so she could share it with her colleagues in the Sparta Post Office, Dawn refused to give it to her; instead, Dawn gave her mother a darkened photocopy of the photograph. It was this scumbled but still readily discernible portrait that Swingle showed to several of her fellow workers. *Id.* at 176:24–25, 177:1–2.

One day in October 1995, in response to ongoing sexual banter with a male postal carrier, *id.* at 167:17–25, 168:1–18, Swingle arrived at work with two large pink balloons. She inflated the balloons in the ladies' room of the Sparta Post Office,

placed them underneath her shirt to make it appear that she had grotesquely enlarged breasts, and circulated about the work floor of the Sparta Post Office for five to ten minutes. *Id.* at 157:23–25, 158:1–25, 159:1–5. She posed for a photograph taken by a male postal worker, *id.* at 159:14–17, 160:9–11, *see* Ex. 11, Kirsch Decl., who eventually photocopied the photograph and gave it to Swingle. *Id.* at 160:16–19.

In February 1997, Sparta Postmaster Jerrold Piccola ("Piccola") contacted Karen Tucker ("Tucker"), a Diversity Development Specialist with the United States Postal Service, about a problem between a female and a male employee in the Sparta Post Office. Equal Employment Opportunity ("EEO") Investigative Affidavit of Karen E. Tucker, 5/8/98, Exhibit 21 to Declaration of Robert Kirsch, filed 2/28/01. On February 20, 1997, Tucker visited the Sparta Post Office, met with Piccola to discuss the problem, and then met with the female employee in question, who complained about a chalk drawing on a blackboard in the men's room of a female with male genitalia, which drawing bore the employee's initials. *Ibid.* After Tucker informed Piccola that he should remove the blackboard, she conducted a stand-up talk for all postal employees in the Sparta Post Office regarding the Postal Service's policy of no tolerance for sexual harassment. *Ibid.*; Swingle Depo. II, 20:5–10, 20:20–21. After her talk, Tucker remained at the Sparta Post Office for a time to speak with any employees who might want to speak with her. Swingle Certification ¶ 2(*l* ), at 5.

Swingle alleges that because she did not want to walk past Krysiak and the rest of the work force to speak with Tucker at that time, she obtained Tucker's name and telephone number, which she taped to the side of her work area. *Ibid.* She alleges she told Krysiak the following morning, February 21, 1997, that she "was not going to put up with him anymore," pointing to Tucker's name and telephone number, and warned him not to set foot inside her work space lest she call Tucker. *Ibid.*

Swingle alleges this event precipitated a sea change in Krysiak's behavior. From this point on, Swingle alleges, Krysiak ceased sexually harassing Swingle and began a retaliatory campaign of intimidation, ridicule, isolating her from her fellow workers, and creating work problems for her. *Id.* ¶ 2(m), at 5–6; Initial Certification of Helen M. Swingle, 5/15/97,[2] attached to EEO Investigative Affidavit of Helen M. Swingle, 11/10/97, Ex. 14A to Kirsch Decl., at 2; Information for Pre-complaint Counseling submitted by Helen M. Swingle, 6/12/97, Ex. 14B to Kirsch Decl., at 1; EEO Complaint of Discrimination in the Postal Service filed by Helen Swingle, 8/23/97, Ex. 23 to Kirsch Decl.; Swingle Depo. II, at 128:14–21; Swingle Depo. III, at 65:21–25, 66:1–10.[3] Swingle's claim of unlawful retaliation is based upon the following allegations of Krysiak's conduct.

Swingle alleges that Krysiak prevented Swingle's fellow workers from speaking with her and kept them away from her. Swingle Certification ¶ 2(n), at 6. He allegedly ceased asking Swingle personal questions, and began annoying and distracting her with repetitive palaver. *Ibid.* He also

---

2. Not to be confused with the aforementioned Certification of Helen Swingle, Exhibit D to Declaration of William J. Koy, filed 3/26/01 ("Swingle Certification").

3. The parties omitted to include page 65 of Swingle Depo. III in their submissions. Chambers requested a copy of page 65 from defendant's counsel, and defendant's counsel provided it to chambers and to plaintiff's counsel.

allegedly refused for several months to correct an error he had made on her paycheck by substituting one form of paid leave for another, *ibid.;* Swingle alleges Krysiak used the error as an excuse to verbally abuse her. *Ibid.* Swingle further alleges that Krysiak badgered her for weeks to use her personal vehicle to deliver the mail. *Ibid.*

Swingle further alleges that Krysiak began ensuring that Swingle and the coworker with whom she was romantically involved, Perry Mindo, would no longer be able to coordinate their days off from work. *Id.* ¶ 2(p). She also alleges that Krysiak discredited and delayed her completion of her work, *id.* ¶ 2(q), and allowed city postal carriers to use her government-issued vehicle without refueling it. *Id.* at 7.

Swingle further alleges that Krysiak harassed her about certain "comp time cleanup work," *id.* ¶ 2(r), and denied Swingle "comp time" she was entitled to, forcing her to rectify the problem by calling her union representative. *Ibid.* She also alleges that Krysiak interfered with her relationship with the female postal worker who would substitute for her. *Id.* ¶ 2(s).

Swingle eventually spoke with Carrie Sprich, Clerk Shop Steward, about Krysiak's conduct. *Id.* ¶ 3. On May 14, 1997, Sprich accompanied Swingle to a meeting with Postmaster Piccola, at which Swingle voiced her grievances about Krysiak's conduct. *Id.* ¶ 4, at 7–8. Following the meeting, Piccola forthwith relocated Swingle's work space within the Sparta Post Office. Swingle Depo. II, at 134:10–15.

Swingle requested an appointment with an EEO Counselor on June 2, 1997. Info. Precomplaint Counseling, Ex. 14B to Kirsch Decl., at 1. On or about June 25, 1997, Swingle spoke by telephone with Pilar Zambrano, an EEO Counselor (EEO Compl., Ex. 23 to Kirsch Decl., at 1), who

offered to have Piccola replace Krysiak as Swingle's supervisor. Swingle Depo. III, at 31:15–24. Swingle refused this offer. *Id.* at 32:16–18. Piccola reiterated this offer in July 1997; Swingle again refused. *Id.* at 31:24–25, 32:15–18.

Swingle filed a formal complaint with the EEO Office on August 26, 1997. EEO Compl., Ex. 23 to Kirsch Decl., at 1. She alleges that "[f]iling an EEO complaint brought forth the vindictive wrath of both Mr. Krysiak and his ally, the Postmaster." Swingle Certification ¶ 6, at 8. More specifically, she alleges that Krysiak and Piccola discredited her work, questioned her productivity, ridiculed her in front of her fellow workers, isolated her from her fellow workers, and imposed restrictions and conditions upon her in violation of her rural carrier contract and Postal Service policy. *Ibid.* She fails, however, further to allege just what restrictions and conditions were in fact imposed.

Swingle further alleges that after she filed her EEO Complaint, Krysiak reassigned the female worker who would substitute for her and in the substitute's place allowed clerks and janitors to deliver mail along Swingle's mail route, allegedly resulting in "a backed-up mess." *Id.* ¶ 8, at 9. She also alleges that Krysiak insisted that one of the persons on Swingle's mail route file a complaint against Swingle, *id.* ¶ 9; that Krysiak swamped her with work, *id.* ¶ 10; that Krysiak continued to deny her the "comp time" for which she was entitled, *id.* ¶ 11; that Krysiak made her job more inconvenient, *id.* ¶ 12; and that Krysiak stood with his hands on his hips and "timed" Swingle's job performance, *id.* ¶ 13, at 10.

Swingle alleges that Krysiak continued behaving in this manner towards her through his departure from his superviso-

ry position at the Sparta Post Office in August 1998. *See supra* p. 627.

On February 5, 1999, the Postal Service issued a final decision of "no discrimination" against Swingle. Swingle Am. Compl. ¶ 14, at 3.[4] In the wake of this decision, Swingle instituted this action by filing her original Verified Complaint on April 21, 1999.

Along with Postmaster General and the Postal Service, Swingle in her original Verified Complaint named several persons as defendants in their official and individual capacities. By consent order filed on May 2, 2000, those defendants were dismissed from this action, leaving Henderson and the Postal Service as the only defendants. As only the Postmaster General is a proper party defendant in this action, 42 U.S.C. § 2000e–16(c), and as any wrongful and actionable acts of the Postmaster General are chargeable as acts of the Postal Service, *Loeffler v. Frank*, 486 U.S. 549, 562 n. 8, 108 S.Ct. 1965, 1973 n. 8, 100 L.Ed.2d 549 (1988), the Postal Service shall be dismissed from this action, and the caption of this action shall be amended to reflect such dismissal.

Henderson responded to the Amended Complaint by filing the instant motion for summary judgment-which was procedurally proper. *Fuller v. Frank*, 916 F.2d 558, 563 (9th Cir.1990).

### DISCUSSION

#### Summary Judgment

A motion for summary judgment shall be granted only if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Material facts are those that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue exists if the record taken as a whole could lead a rational trier of fact to find for the party opposing summary judgment. *Matsushita Elec. Indus.Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In disposing of a motion for summary judgment, it is not the province of the trial court to weigh the evidence and to decide the case on its merits; rather, the trial court shall simply determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. In determining whether there is a genuine issue for trial, the trial court must resolve all doubts, and must make all reasonable inferences, in the non-movant's favor. *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 631 (3rd Cir.1998) (reviewing *de novo* trial court's grant of summary judgment); *Newsome v. Admin. Office of Courts*, 103 F.Supp.2d 807, 817 (D.N.J. 2000) (Title VII case).

In Title VII cases, courts must view summary judgment with special caution, because impermissible discriminatory intent and proof of disparate treatment can be difficult to establish. *Hastie v. Henderson*, 121 F.Supp.2d 72, 77 (D.D.C. 2000). However, given the importance of combating and preventing discrimination and sexual harassment in the workplace, and the corresponding importance of insuring the availability of Title VII remedies to truly aggrieved workers, a court faced with frivolous or meritless sexual harassment claims should not hesitate to grant summary judgment in the defendant's favor.

---

4. The parties omitted to include a copy of the Postal Service's decision in their submissions. Chambers requested a copy of the decision from defendant's counsel, and defendant's counsel provided a copy of the decision to chambers and to plaintiff's counsel.

## Exhaustion of Administrative Remedies

On August 23, 1997, the date Swingle filed her complaint with the Equal Employment Opportunity Commission, the regulations implementing 42 U.S.C. § 2000e–16 (among other federal anti-discrimination statutes) provided, in pertinent part, as follows:

(a) Aggrieved persons who believe they have been discriminated against on the basis of ... sex ... must consult a[n EEO] Counselor prior to filing a complaint [with the EEOC] in order to try to informally resolve the matter.

(1) An aggrieved person must initiate contact with a **Counselor within 45 days of the date of the matter alleged to be discriminatory** or, in the case of personnel action, within 45 days of the effective date of the action.

(2) The agency or the Commission shall extend the 45 day limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been [sic] known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105 (revised as of July 1, 1997) (emphasis added).

Swingle requested an appointment with an EEO Counselor on June 2, 1997. Info. Precomplaint Counseling, Ex. 14B to Kirsch Decl., at 1. Thus, no acts of discrimination allegedly committed prior to the forty-five day limitations period, i.e. before April 18, 1997, remained actionable after June 2, 1997. As Henderson has raised the limitations period in response to Swingle's Amended Complaint, *see* Henderson's Memorandum in Support of Motion for Summary Judgment at 58–60, all acts of discrimination allegedly committed before April 18, 1997 are barred for Swingle's failure timely to have exhausted her administrative remedies. *E.g. Koschoff v. Henderson,* 109 F.Supp.2d 332, 343–44 (E.D.Pa.2000) (applying 29 C.F.R. § 1614.105(a)(1)).[5] This means Swingle's disparate-treatment and hostile-work-environment claims are barred, *see supra* pp. 628–30, and only her unlawful retaliation claim is left, *see supra* pp. 629–31.

Swingle makes no argument under 29 C.F.R. § 1614.105(a)(2) that she should somehow be exempted from the timely-exhaustion-of-administrative-remedies requirement imposed by subsection 1614.105(a)(1), *see* Swingle's Memorandum in Opposition to Motion for Summary Judgment at 37–41. She has thus waived such argument.

---

**5.** Swingle alleges that Piccola initiated contact with an EEO Counselor by leaving a message on Tucker's answering machine during the May 14, 1997 meeting between Swingle, Sprich, and Piccola. Swingle Depo. II, at 134:16–24. However, it is undisputed that Tucker was at that time employed by the Postal Service as a Diversity Development Specialist, and was not employed by any EEO-affiliated entity. Tucker Aff., Ex. 21 to Kirsch Decl.; Declaration of Karen E. Tucker, 4/9/01, ¶ 3, at 1. (Chambers requested further information from defendant's counsel about Tucker's job title and employer on February 20, 1997 and May 14, 1997; defendant's counsel secured the Tucker Declaration and provided it to chambers and to plaintiff's counsel.) However, even if Swingle had initiated contact with an EEO Counselor through Piccola and Tucker on May 14, 1997 (meaning that the limitations period would have begun to run on March 28, 1997), this would not affect the legal outcome.

■ In her vain attempt to circumvent the requirement that she have timely exhausted her administrative remedies, Swingle invokes the theory of continuing violations. "Under this theory, a plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if [s]he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3rd Cir.1995).

For Swingle to preserve her claims predating April 18, 1997, she must show, *inter alia*, that both the timely and untimely alleged acts "involve the same type of discrimination." *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476 (quoting and following *Berry v. Bd. of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983)). Plaintiff's only timely claims are for unlawful retaliation, *see supra* pp. 629–30; therefore, only plaintiff's retaliation claim might theoretically be retrojected to encompass acts dating from February 21, 1997, the date Krysiak's retaliation allegedly began, *see supra* p. 629, through April 18, 1997. However, Swingle has conceded that Krysiak did not sexually harass or sexually discriminate against her from February 21, 1997 onward, *see supra* p. 629; this renders the continuing-violations theory inapplicable to Swingle's case. *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir.1997) ("The continuing violation theory also cannot save [plaintiff's] case because there is no anchor allegation of sexual harassment within the applicable limitations period.").

Leaving aside Swingle's failure timely to exhaust her administrative remedies, summary judgment must still be granted in Henderson's favor because none of Swingle's discrimination claims has merit.

### Disparate Treatment Gender Based Employment Discrimination

For Swingle to state a prima facie claim of disparate-treatment gender-based employment discrimination in violation of 42 U.S.C. § 2000e–16, she must establish that (i) she is a member of a protected class; (ii) she suffered an adverse employment action; and (iii) the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999). However, Swingle has freely admitted that she has never been fired, suspended, demoted, docked in pay, denied a promotion, or reprimanded in writing. Swingle Depo. II, at 145:3–24. Further, none of Krysiak's conduct towards Swingle through February 21, 1997 amounted to, or resulted in, an "adverse employment action." *See supra* pp. 628–30. Therefore, Swingle's claim of disparate-treatment gender-based discrimination must fail. *Hastie*, 121 F.Supp.2d at 82–83.

### Hostile Work Environment Gender Based Employment Discrimination

■ For Swingle to state a prima facie claim of hostile-work-environment gender-based employment discrimination in violation of 42 U.S.C. § 2000e–16, she must establish that (i) she suffered intentional discrimination because of her sex, *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3rd Cir.1990); (ii) the discrimination was severe or pervasive, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998); (iii) the discrimination detrimentally affected her, *Andrews*, 895 F.2d at 1482; (iv) the discrimination would detrimentally affect a reasonable woman in her position, *ibid.*; and (v) respondeat superior liability inheres, *ibid.* Hostile-work-environment claims do not require a showing of an adverse employment action or conse-

quence, *Brody*, 199 F.3d at 454—or even of a "personnel action," as that term is used in 42 U.S.C. § 2000e–16. *Hayes v. Shalala*, 902 F.Supp. 259, 266–67 (D.D.C.1995).

Assuming arguendo Swingle's hostile-work-environment claim were not barred by her failure timely to have exhausted her administrative remedies, her allegations of Krysiak's unwanted touching and his inappropriate sexually-oriented behavior and comments would suffice to meet the first four elements of such a claim, and her inability to show an adverse employment action would not vitiate the claim. However, as Henderson can make out an affirmative defense to the fifth element, respondeat superior liability, Swingle's claim fails on the merits.

### An Employer's Affirmative Defense to Respondeat Superior Liability on an Employee's Hostile–Work–Environment Gender–Based Discrimination Claim

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270. Where an employee has not been subjected to tangible employment action and alleges that she has been subjected to a hostile work environment, an employer can prevail on an affirmative defense to respondeat superior liability if it shows (i) that it exercised "reasonable care to prevent and correct promptly any sexually harassing behavior"; and (ii) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ibid.* Henderson's ability to make both showings required by *Ellerth* dooms Swingle's hostile-workenvironment claim on the merits.

### The Postal Service Exercised Reasonable Care To Prevent Sexual Harassment

■ It is undisputed that from the time Swingle began working for the Postal Service on September 7, 1991 through the present, it has been the official and avowed policy of the Postal Service that sexual discrimination against or sexual harassment of postal employees is unlawful and will not be tolerated. To this end, the Postal Service has sought to prevent sexual discrimination and sexual harassment in the workplace, and to provide a prompt, discreet, readily available, and effective means of redressing and remediating the effects of such unlawful conduct. This the Postal Service has done by taking the following undisputed actions.

### Orientation Training

Before she began working at the Sparta Post Office, Swingle attended orientation training sessions at the Postal Employee Development Center ("PEDC") in Paterson, New Jersey, and at the Sparta Post Office itself. Swingle Depo. I, at 12:3–25, 13:1–4. According to the undisputed declaration of Anita Bundick, who was the Training and Development Specialist at the PEDC when Swingle received her orientation training, all employees who received such training at the PEDC were informed about the Postal Service's anti-discrimination policies and the availability of pursuing recourse for employment discrimination through the EEO program. Declaration of Anita Bundick, 2/1/01, Ex. 16 to Kirsch Decl., ¶ 3, at 1; ¶ 6, at 2. More specifically, this orientation training "included instruction that sexual harassment was not tolerated by the Postal Service, and advised attendees that they should apprise a neutral supervisor, the Postmaster, or the EEO directly in the event they believed they were subjected to

sexual harassment." *Id.* ¶ 7, at 2. In addition, trainees "received an orientation packet of written materials, which again advised employees of the Postal Service's policies and procedures regarding sexual harassment and other types of discrimination." *Id.* ¶ 8, at 2.

### Posters

On or about May 2, 1994, Hugo F. Gumbs, Human Resources Manager for the Central New Jersey District of the Postal Service, sent a memorandum to all postmasters and plant managers in the district, which included the Sparta Post Office, directing that two posters enclosed with the memorandum be posted on the work floors and office lobbies of all post offices within the district. Poster 21, dated July 1993, is entitled, in conspicuously large capital letters, "THE USPS WILL NOT TOLERATE SEXUAL HARASSMENT IN THE WORKPLACE"; Poster 72, dated December 1993, is entitled, in conspicuously large capital letters, "EQUAL OPPORTUNITY IS THE LAW." Declaration of Hugo F. Gumbs, 2/9/01, Ex. 17 to Kirsch Decl., ¶¶ 4–6, at 2. In accordance with this directive, these posters were promptly and prominently displayed in several appropriate locations in the Sparta Post Office until they were replaced by updated posters regarding the same policies. Declaration of Daniel Janiec, 1/19/01, Ex. 5 to Kirsch Decl., ¶ 3, at 1; ¶¶ 11–12, at 3. Posters 21 and 72 are attached to the Gumbs and Janiec Declarations.

Poster 21 describes sexual harassment in the workplace as "[m]aking or threatening to make employment decisions based on an employee's submission to or rejection of sexual advances or requests for sexual favors"; "[d]eliberate or repeated unsolicited remarks with a sexual connotation or physical contacts of a sexual nature that are unwelcome to the recipient"; and

"[a] sustained hostile and abusive work environment so severe that it changes the terms and conditions of one's employment." It warns that "[e]mployees who are found to have engaged in sexual harassment should expect serious disciplinary action, including removal." It notifies employees who believe that they are the victims of sexual harassment that they may seek relief through the EEO complaint process, the grievance-arbitration procedure for bargaining-unit employees under collective bargaining agreements, or the grievance procedures for nonbargaining-unit employees, and that they may also report sexual harassment to impartial supervisors or managers. Finally, it reminds managers and supervisors that they "are charged with the responsibility for preventing sexual harassment in the workplace and, if sexual harassment occurs, for taking *immediate and appropriate corrective action.*" Poster 21 (italics and emphasis in original).

Poster 72 outlines how postal employees may present EEO problems. It provides that postal employees who feel they have been subjected to sex discrimination on the job, or retaliation for past EEO activity, may request EEO counseling. It prescribes that employees must request such counseling "[w]ithin 45 *calendar* days of the date of the alleged discriminatory act or, if a personnel action is involved, within 45 *calendar* days of its effective date." Poster 72 (italics in original). It advises employees who wish to submit a request for counseling to do so orally or in writing and to include certain salient information. It lists the address and telephone numbers of the EEO Office for the Central New Jersey District. It describes what will happen once an employee submits a counseling request, and makes clear that an employee submitting such a request may ask that her "*name not be used during the*

*counseling portion of the EEO complaint process.*" Poster 72 (italics in original).

### Piccola's Weekly Talks

As Postmaster of the Sparta Post Office, Piccola gave his employees weekly talks to apprise them or remind them of Postal Service policies. Piccola Depo., Ex. 2 to Kirsch Decl., at 75:5–17, 76:12–16. Piccola reiterated the Postal Service's sexual-harassment policies at these talks. *Ibid.*

### Swingle's Union Contract

Swingle's union contract, a copy of which she produced to the defendants on November 9, 2000, prior to her second deposition, Swingle Depo. II, at 51:23–25, 52:1–7, clearly states that the Postal Service and the union agreed that union-affiliated postal employees would not be subjected to sex discrimination on the job, and that union-affiliated employees would be entitled to file grievances based upon such discrimination pursuant to the grievance procedures set forth in the contract. Agreement between United States Postal Service and National Rural Letter Carriers' Association, 1995–1999, Ex. 18 to Kirsch Decl., at 2–3. Those grievance procedures, set forth in Article 15 of the contract, *id.* at 57–63, set forth the protocol when a union employee has filed an EEO complaint alleging discrimination. *Id.* at 62–63.[6] Swingle referred to these grievance procedures at least once before filing two grievances; Swingle Depo. I, at 107:5–25, 108:1–24.

### *Postal Life* Magazine

Swingle received in the mail at her home copies of *Postal Life,* a quarterly magazine published by the Postal Service for its employees. Swingle Depo. I, at 32:17–25 through 35:8; Declaration of Pamela G. York ("York"), 2/16/01, Ex. 20 to Kirsch

Decl., ¶ 2, at 1. The September/October 1996 issue of *Postal Life,* attached to the York declaration, featured a cover story listed on the cover as, and entitled, "SEXUAL HARASSMENT: It's about abuse of power not sex." *Postal Life,* Sept./Oct. 1996, cover (uppercase in original, punctuation added). The cover story refers to the Postal Service's formal, avowed policy on sexual harassment in the workplace, and describes what postal employees who think they have been sexually harassed should do to stop the harassment. *Id.* at 18.

■ "[W]here, as here, there is no evidence that an employer adopted or administered an antiharassment policy in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer 'exercised reasonable care to prevent' and promptly correct sexual harassment." *Brown v. Perry,* 184 F.3d 388, 396 (4th Cir.1999) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 808, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998)).

The foregoing recitation of undisputed facts establishes unequivocally that the Postal Service exercised reasonable care to prevent sexual harassment and gender-based discrimination during the time Swingle alleges she was subjected to a hostile work environment. Though Swingle does not dispute these facts, *see* Swingle Memo. Opp. Mot. Summ. J. at 33–37, she relies on *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437 (10th Cir.1997), to support her untenable argument that Henderson should not be able to make out the first element of the affirmative defense enounced in *Ellerth* because Swingle had no actual knowl-

---

**6.** The parties omitted to include pages 57 through 63 inclusive of the contract in their submissions. Chambers requested copies of these pages from defendant's counsel, and defendant's counsel provided them to chambers and to plaintiff's counsel.

edge of the Postal Service's anti-harassment policies and remedies until Tucker's February 20, 1997 sexual-harassment seminar. *Harrison* is distinguishable from the instant case because the plaintiff's employment materials in that case made no mention of the employer's sexual-harassment policy; *see Harrison*, 112 F.3d at 1442. Moreover, *Ellerth* nowhere requires that an employee must have had actual knowledge of the employer's anti-discrimination and anti-harassment policies before the discrimination or harassment allegedly occurred for the employer to avail itself of the affirmative defense to respondeat superior liability.

### The Postal Service Exercised Reasonable Care Promptly To Correct Any Sexual Harassment

The Postal Service's exercise of reasonable care promptly to correct any sexual harassment to which Swingle might have been subjected is not only borne out by the Postal Service's repeated, widespread, and intensive dissemination of its clear and comprehensive anti-harassment and anti-discrimination policies, but also by the successful actions Piccola took to prevent Swingle from being subjected to sexual discrimination or sexual harassment.

■ Following Swingle's meeting with Sprich and Piccola on May 14, 1997, Piccola forthwith relocated Swingle's work space within the Sparta Post Office.[7] *See supra* p. 630. Significantly, twice Swingle was offered a new supervisor to replace Krysiak, yet twice she refused the offer. *See supra* p. 629. Most importantly, however, Swingle herself alleges that Krysiak's sexual harassment ended on February 21, 1997, in the wake of Tucker's anti-

harassment seminar the previous day-almost three months before her meeting with Sprich and Piccola on May 14, 1997. *See supra* p. 629. "[W]hen an employer's response stops harassment, there cannot be Title VII liability." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3rd Cir.1999); *accord Newsome*, 103 F.Supp.2d at 819–820.

These undisputed facts establish unequivocally that the Postal Service exercised reasonable care promptly to correct alleged sexual harassment and gender-based discrimination during the time Swingle alleges she was subjected to a hostile work environment.

### Swingle Unreasonably Failed To Take Advantage of Opportunities Provided by the Postal Service To Prevent Further Alleged Sexual Harassment

■ As noted above, Swingle twice refused the offer of a replacement supervisor for Krysiak. Swingle's refusal was an unreasonable failure to take advantage of an opportunity provided by the Postal Service to prevent further alleged sexual harassment by Krysiak and to alleviate the hostile work environment his conduct allegedly created. If an employer chooses an adequate remedy to prevent sexual harassment, the aggrieved employee cannot object to such a remedy and dictate instead that her employer take such remedial action as the employee deems appropriate. *Knabe v. Boury Corp.*, 114 F.3d 407, 414 (3rd Cir.1997).

As Henderson can make out both elements of the affirmative defense to respondeat superior liability enounced in *Ellerth*,

---

7. Swingle alleges this action was ineffectual because Krysiak was moved back into her work area soon after her desk was relocated. However, the case upon which Swingle relies to support this argument, *Hollis v. City of*

*Buffalo*, 28 F.Supp.2d 812 (W.D.N.Y.1998), is distinguishable: in *Hollis*, the plaintiff continued to be sexually harassed after her supervisor was moved out of her work area. *Hollis*, 28 F.Supp.2d at 822.

Swingle's claim of a hostile work environment must fail on its merits.

## Unlawful Retaliation

■ For Swingle to state a prima facie claim of unlawful retaliation in violation of 42 U.S.C. § 2000e–2(a) and 42 U.S.C. § 2000e–3(a), she must establish that (i) she engaged in activity protected by Title VII; (ii) the Postal Service took a materially adverse employment action against her; and (iii) there was a causal connection between her participation in the protected activity and the adverse employment action. *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1299–1300 (3rd Cir.1997). (quoting and following *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3rd Cir.1995)). Retaliatory conduct besides discharging an employee or refusing to rehire her is only actionable under Title VII if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives her of employment opportunities, or adversely affects her status as an employee. *Robinson,* 120 F.3d at 1300 (citations omitted) (applying 42 U.S.C. § 2000e–2(a) and 42 U.S.C. § 2000e–3(a)).

Swingle does allege, generically, that Krysiak imposed restrictions and conditions upon her in violation of her rural carrier contract and Postal Service policy, *see supra* p. 629; she fails, however, to specify just what restrictions and conditions were. Furthermore, none of Krysiak's alleged conduct after June 2, 1997, the date Swingle engaged in activity protected by Title VII by requesting an appointment with an EEO Counselor, *see supra* p. 630, resulted in a materially adverse employment action against Swingle. *See Robinson,* 120 F.3d at 1301. Most importantly, Swingle has acknowledged that she has never been fired, suspended, demoted, docked in pay, denied a promotion, or reprimanded in writing. *See supra* pp. 629–30. As Swingle has never suffered any materially adverse employment action, retaliatory or otherwise, her unlawful retaliation claim must fail on the merits.

## CONCLUSION

"It scarce need be said that Title VII is not a shield against harsh treatment in the workplace; it protects only in instances of harshness disparately distributed. The essence of the action is, of course, discrimination." *Jackson v. City of Killeen,* 654 F.2d 1181, 1186 (5th Cir.1981). As Swingle failed timely to exhaust her administrative remedies, and as none of her gender-based employment discrimination or sexual-harassment claims has merit, summary judgment must be entered in the defendant's favor.

An appropriate order has been entered.